Jeramy D. Webb (*pro hac vice* pending)
Andrew J. Miller (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email:  jeramy.webb@lw.com
            andrew.miller@lw.com

Caroline A. Reckler
Jonathan J. Weichselbaum (*pro hac vice* pending)
Alexandra M. Zablocki (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  caroline.reckler@lw.com
            jon.weichselbaum@lw.com
            alexandra.zablocki@lw.com

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Huachen Energy Co., Ltd.,[1]<br><br>      Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 22-10005 (LGB) |

## VERIFIED PETITION UNDER CHAPTER 15 FOR
## RECOGNITION OF A FOREIGN MAIN PROCEEDING AND RELATED RELIEF

Ernst & Young Hua Ming LLP, in its capacity as the duly authorized foreign representative (the "Foreign Representative") of Huachen Energy Co., Ltd. (the "Debtor"), which is the subject of a bankruptcy reorganization proceeding (the "PRC Proceeding") currently pending before the No. 1 Intermediate People's Court of Beijing (the "PRC Court") under Article 71 of the Enterprise Bankruptcy Law of the People's Republic of China (the "Enterprise Bankruptcy Law"), respectfully submits this verified petition (the "Verified Petition," and together with the Form of Voluntary Petition [Docket No. 1], the "Petition").

---

[1]  The last four digits of the Debtor's Unified Social Credit Code are 6704.  The location of the Debtor's registered office is 3/F, Building 4, Guoxingjiayuan, No. 20 Shouti South Road, Haidian District, Beijing, People's Republic of China.

In support of the Petition, the Foreign Representative has concurrently filed herewith the *Declaration of Minhai Liang in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Liang Declaration"), and is incorporated herein by reference as if fully set forth here.  In further support of the relief requested herein, the Foreign Representative respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Debtor, which was incorporated with limited liability under the laws of the People's Republic of China (the "PRC"), seeks to adjust certain of its debt obligations through a reorganization plan proposed by the Foreign Representative pursuant to Article 79 of the Enterprise Bankruptcy Law (the "Plan"),[2] which must, generally speaking, be approved by a requisite majority of the affected creditors and ultimately approved by the PRC Court under the Enterprise Bankruptcy Law to become effective.[3]  By filing this Petition to seek recognition and enforcement of the PRC Proceeding and the Plan in the territorial jurisdiction of the United States, the Foreign Representative seeks to mitigate against the risk of a dissenting creditor suing under the Indenture (as defined below) in a U.S. court and frustrating the Debtor's successful financial restructuring.[4]

2.      The Debtor is one of the largest private thermal power generators in the PRC, owning and operating thermal coal and gas-fired plants as well as renewable energy photovoltaic power plants.  Its power generation business is primarily located in the Jiangsu and Henan

---

[2]  A copy of the Plan, translated into English, is annexed hereto as **Exhibit B**.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3]  In certain exceptional circumstances, the PRC Court may approve a reorganization plan even if the requisite majority of affected creditors did not vote in favor of it.

[4]  As discussed in further detail herein, the Indenture contains a New York law provision, and approximately 90% of the Noteholders (as defined below) are located outside of the PRC (excluding Hong Kong and Macau).

provinces of the PRC.  Further information regarding the Debtor and its balance sheet and operations is set forth below.

3.       Due to an ongoing inability to repay its debts when due and difficulties in implementing a consensual restructuring with its creditors that are located or based in the PRC (the "Onshore Creditors"), including certain holders of the RMB Bonds, the Debtor is implementing a restructuring of all its debts pursuant to the PRC Proceeding and the Plan (the "Financial Restructuring").  To implement the Financial Restructuring, the Debtor commenced the PRC Proceeding, which enabled the Foreign Representative, in its capacity as the Debtor's bankruptcy administrator (the "Administrator"), to propose the Plan and allowed the Debtor's secured and unsecured creditors to vote on the Plan at a meeting of creditors (the "Second Meeting").

4.       As part of its turnaround strategy, the Debtor engaged in ongoing negotiations (both prior to and after the commencement of the PRC Proceeding) concerning a consensual restructuring with both its Onshore Creditors and its offshore creditors (composed of the Noteholders (as defined below)) and, on September 10, 2021, the Debtor entered into a non-binding memorandum of understanding with the Ad Hoc Committee (as defined below) under which the parties thereto agreed, in principle, to the key terms of the Financial Restructuring (insofar as it relates to the Notes) and to negotiate in good faith the method of its implementation.

5.       The Plan is a key step towards implementing the Financial Restructuring, which—if successfully implemented—will, among other things, significantly reduce the Debtor's debt service costs.

6.       During the PRC Proceeding process and as discussed further herein, the PRC Court approved the Plan.  The Debtor has commenced this chapter 15 case (the "Chapter 15 Case") to

obtain recognition of the PRC Proceeding as a foreign main proceeding and related relief.[5]  For

the reasons set forth below, the Foreign Representative respectfully requests that this Court grant

the relief requested herein.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska,

C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District

pursuant to 28 U.S.C. § 1410 because the Debtor's principal tangible asset in the United States—

the Retainer Account (as defined below)—is located in this District.  Moreover, the Debtor is party

to the Indenture, which is governed by New York law and contains a New York forum selection

clause.  *See* Liang Declaration ¶ 28.  The statutory bases for relief are sections 105(a), 1507, 1517,

1520, and 1521 of the Bankruptcy Code.

## RELIEF REQUESTED

8.     The Foreign Representative respectfully requests the entry of an order, substantially

in the form attached hereto as **Exhibit A** (the "Proposed Order"):

    a.    finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of the Bankruptcy Code, (ii) the PRC Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

    b.    granting recognition of the PRC Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

---

[5]  The Foreign Representative is not seeking provisional relief at this time because he is not aware of any imminent threat to the Debtor's assets located within the territorial jurisdiction of the United States or to the PRC Proceeding by virtue of actions in the United States.  If circumstances change or the Foreign Representative becomes aware of additional facts, the Foreign Representative reserves all rights to seek provisional relief pursuant to section 1519 or other applicable sections of title 11 of the United States Code (the "Bankruptcy Code") to protect the Debtor and its assets.

c.      granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

d.      recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the PRC Proceeding, the Plan, and the order of the PRC Court approving the Plan (the "<u>Approval Order</u>"), including giving effect to the Releases (as defined herein);

e.      permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Plan (the "<u>Injunction</u>");

f.      directing the Debtor, the Trustee (including any replacement trustee, as may be applicable), and any other relevant party to execute and deliver all consents, instruments, releases of liens and encumbrances or documents of similar effect, and other documents necessary to give effect to the Plan, and authorizing the Trustee to file such documents to the extent necessary in connection therewith (the "<u>Direction</u>");

g.      waiving the 14-day stay of effectiveness of the Proposed Order; and

h.      granting related relief.

## <u>BACKGROUND</u>

9.    The following is an overview of the Debtor, the events leading up to the PRC Proceeding and the Plan, the origins and development of the Plan, and the filing of the PRC Proceeding, all as of the date of the filing of the Petition.  The Foreign Representative respectfully refers the Court to the Liang Declaration for additional information.

**I.    <u>Introduction to the Debtor</u>**

**A.    The Debtor**

10.    Established on December 27, 1999, the Debtor was incorporated with limited liability under the laws of the PRC, is one of the largest private thermal power generators in the PRC measured by installed capacity, and has registered capital of RMB 10 billion ($1.569 billion).[6]

---

[6]  U.S. dollar figures referenced herein are approximate as of January 4, 2022.

In addition to its thermal coal and gas-fired plants, the Debtor also owns and operates photovoltaic power plants, which are renewable energy power plants.

11.    The Debtor develops, manages, and operates traditional energy and clean energy power plants in the Jiangsu and Henan provinces in the PRC.  Its traditional energy power plants consist of coal-fired power plants.  Its clean energy power plants include gas-fired power plants and renewable energy power plants, such as photovoltaic power plants.

12.    The Debtor primarily sells electricity to state-owned provincial-level power grid companies in Jiangsu and Henan provinces. It also sells electricity directly to large power end-users.

13.    Apart from power generation, the Debtor also conducts other business, including the sale of heat, power trade, provision of maintenance services, financial investment and sale of power generation by-products, such as fly ash and plaster.

14.    The Debtor's registered office and headquarters are located in the PRC, as are the Debtor's senior management (including its Chief Executive Officer, Non-Executive Chairman, Chief Financial Officer, and other senior members of management) and its single non-managerial employee.  All key corporate activities for the Debtor, including meetings of the board of directors, occur in the PRC, and its books and records are located in the PRC.  The Debtor's debt documents and other public filings typically state that the Debtor is registered in the PRC and that its registered office is located in the PRC.

15.    The Debtor has connections to the United States.  As further explained below, the Indenture governing the primary USD debt obligations to be compromised under the Plan is governed by New York law and contains a New York forum selection clause.  The Debtor also has assets in the United States in the form of interests in a $25,000 retainer with the New York office

of Latham & Watkins LLP, which is being held in a client trust account located in New York (the "Retainer Account").

**B.      The Debtor's Notes**

16.      The Debtor issued 6.625% senior secured notes (the "Notes," and the beneficial holders thereof, the "Noteholders") pursuant to an indenture dated as of May 18, 2017 (as amended and supplemented from time to time, the "Indenture"), by and between the Debtor and Citicorp International Limited, as trustee (or any replacement trustee, the "Trustee"). The Indenture is governed by New York law and contains a New York forum selection clause. *See* Indenture § 11.05. As of November 23, 2021, approximately 90% of the Noteholders are located outside of the PRC.

17.      The Notes are unsecured obligations of the Debtor and originally had a maturity date of May 18, 2020. On November 18, 2019, the Debtor defaulted on its obligation to make interest payments then due. On January 20, 2020, certain Noteholders gave notice to the Debtor declaring the outstanding principal amounts on the Notes to be immediately due and payable. As of August 20, 2021 (the date of commencement of the PRC Proceeding), the total amount outstanding under the Notes was approximately $578,019,266 (RMB 3,684,063,593.78), inclusive of principal and accrued and unpaid interest, but exclusive of any fees or expenses payable to the Trustee or the agents in respect of the Notes.

18.      The Notes are listed for trading on the Singapore Stock Exchange (the "SGX").

**C.      Other Liabilities**

19.      In addition to the Notes (which currently represent unsecured liabilities of the Debtor), the Debtor has other debts and liabilities as follows:

a.      secured debts or claims arising out of guarantees that the Debtor executed for the debts of its affiliated companies and for which the Debtor mortgaged or pledged its property (the "Secured Claims"), the value of which claims

are estimated to be RMB 5,063,049,156.35 (approximately $794,392,412.63) (as of August 20, 2021);

b.    unsecured debts or claims arising out of guarantees that the Debtor executed for the debts of its affiliated companies, with respect to which the Debtor is <u>not</u> the principal or primary debtor (the "<u>Guaranteed Claims</u>"), the value of which claims are estimated to be RMB 11,570,696,738.67 (approximately $1,815,442,318.30) (as of August 20, 2021);

c.    unsecured debts or claims with respect to which an affiliated company of the Debtor is the creditor (the "<u>Affiliated Ordinary Claims</u>"), the value of which claims are estimated to be RMB 2,157,883,836.03 (approximately $338,571,973.87) (as of August 20, 2021);

d.    unsecured debts or claims in respect of the RMB-dominated bonds "16 Huachen 01" (bond code: 136875) (the "<u>RMB Bonds</u>"), the value of which claims are estimated to be RMB 2,193,466,027.34 (approximately $344,154,819.69) (as of August 20, 2021); and

e.    other unsecured debts or claims which do not comprise the Notes or fall within any of the above categories (the "<u>Other Ordinary Claims</u>"), the value of which claims are estimated to be RMB 52,847,289.88 (approximately $8,291,739.78) (as of August 20, 2021).

**D.    The Debtor's Appraisal**

20.    According to an asset appraisal report issued August 20, 2021, the total appraised value of the Debtor's assets is RMB 13,316,751,800 ($2,089,398,357.42) (consisting of RMB 3,610,585,600 ($566,500,880.64) in current assets and RMB 9,706,165,200 ($1,522,897,319.88) in non-current assets).

21.    The Plan separates the Debtor's creditors into two classes: (a) "Secured Creditors" and (b) "Ordinary Creditors."  Secured Creditors are creditors with Secured Claims, and the class composed of such claims is equivalent to a class of secured claims under the Bankruptcy Code. Ordinary Creditors are creditors with "common" claims against the Debtor that are not secured by any of the Debtor's assets (the "<u>Ordinary Claims</u>"), comprising the Guaranteed Claims, the Affiliated Ordinary Claims, the RMB Bonds, the Notes, and the Other Ordinary Claims.  This class

is equivalent to a class of general unsecured claims under the Bankruptcy Code.  Both Secured Creditors and Ordinary Creditors are creditors who are subject to the Plan (the "Plan Creditors").

22.     As of November 19, 2021, the Debtor's creditors assert claims with a total value of RMB 25,517,735,297 ($4,003,732,668.10) (comprised of Secured Claims of RMB 5,278,049,156 ($828,125,912.58) and Ordinary Claims of RMB 20,239,686,142 ($3,175,606,755.68). As of the date of submission of the Plan, the total amount of creditors' claims to which the Debtor and its creditors have not objected is RMB 24,547,649,639 ($3,851,526,228.36), of which RMB 5,063,049,156.35 ($794,392,412.63) represents Secured Claims and RMB 19,484,600,483.12 ($3,057,133,815.80) represents Ordinary Claims.

23.     The Debtor also requested and received a "Solvency Analysis Report," which illustrates the priority of its various creditor groups and the amounts each such group could expect to receive in the event of the Debtor's liquidation.  If the Debtor's assets were to be liquidated, the proceeds would first be used to repay Secured Creditors.  The remaining proceeds would then be used to pay bankruptcy expenses of RMB 50,000,000 ($7,845,000) and then to pay Ordinary Creditors holding an Ordinary Creditors' Right (including the Noteholders).  Assuming that the Debtor could receive the full value of its assets (as assessed in the report) —and assuming the accuracy of estimated bankruptcy expenses—Ordinary Creditors could expect to recover approximately 44.09% on their claims.

## II.     Circumstances Leading to the Current Restructuring

24.     From around July 2018, the Debtor started to encounter a challenging funding environment and liquidity pressures, which coincided with the tightening of PRC financing policies and debt defaults by its parent company, Wintime Energy Co., Ltd. ("Wintime Energy"). Eventually, on November 18, 2019, the Debtor failed to make the interest payments due on the Notes.

25.     On January 22, 2020, the Debtor received a notice issued by various Noteholders (the "EOD Notice") stating that an Event of Default (as defined in the Indenture) had occurred and declaring that the principal of, premium, if any, and accrued and unpaid interest on the Notes to be immediately due and payable.

26.     In response to the EOD Notice and in order to achieve a better return for its creditors as a whole, the Debtor considered it appropriate to pursue a restructuring of the Notes and announced of such intention to the Noteholders on April 21, 2020. Since then, the Debtor has been in discussions with an ad hoc committee of holders of the Notes advised by Kirkland & Ellis and Houlihan Lokey (as constituted from time to time, the "Ad Hoc Committee") concerning the terms of the Financial Restructuring.  As of September 10, 2021, the date when the MOU was executed, the Ad Hoc Committee composed of eight (8) Noteholders representing 54.7% in aggregate principal amount of the outstanding Notes.

27.     At around the same time, Wintime Energy underwent its own bankruptcy reorganization proceeding pursuant to Chapter 8 of the Enterprise Bankruptcy Law.  In December 2020, the Intermediate People's Court of Jinzhong Municipality, Shanxi Province, ruled that Wintime Energy had consummated its reorganization plan. Wintime Energy's reorganization plan, however, did not cover the Debtor or its assets, nor did it purport to resolve or compromise the Debtor's debts or liabilities.

III.    **The Debtor's Financial Restructuring**

28.     On September 10, 2021, the Debtor and the Ad Hoc Committee entered into a memorandum of understanding (the "MOU"), which sets out the key terms of the Notes following the restructuring (the "Restructured Notes") and pursuant to which the Debtor and the Ad Hoc Committee agreed to, among other things, enter into negotiations in good faith with a view toward

agreeing on the manner in which the restructuring of the Notes will be implemented, including the forms of the documentation to be executed in connection therewith.

29.  According to the MOU, under the Restructured Notes:

a.  the maturity of the Notes will be extended to the date that is the earlier of (1) the fifth anniversary of the date on which the Plan is approved by the PRC Court and (2) December 31, 2026;

b.  the interest rate with respect to the Notes will be reduced and a portion of accruing interest will be paid in kind; and

c.  additional security interests will be granted to secure the Debtor's obligations in respect of the Notes, including a specified portion of the 26.67% partnership interest held by the Debtor (as a limited partner) in Shanghai Runliangtai Internet of Things Technology Partnership (Limited Partnership) ("Runliangtai") and a specified portion of the 10% equity interest held by Huayuan New Energy Co., Ltd. ("Huayuan New Energy") in Definite Arise Limited ("Definite Arise").

30.  With respect to the additional security, the Debtor holds a 26.67% interest (paid up 17.81% in capital) in Runliangtai, which was established on February 16, 2015.  Runliangtai mainly invests in the internet of things and fintech sector projects, as well as related investment funds. According to a valuation report published by China Enterprise Appraisal Co., Ltd., the Debtor's interest in Runliangtai was valued at RMB 1,524,851,419.18 ($239,249,187.67) as of June 30, 2021.  The Debtor understands that Runliangtai contemplates exiting from and disposing of its investment projects through a sale or initial public offering in the next couple of years. The Debtor and other limited partners have been actively engaged with the general partner, encouraging it to commence the proposed exit and disposal of Runliangtai's investment projects, and thereafter to distribute the investment returns to the limited partners as soon as possible. To the extent the Debtor receives any investment returns, the Debtor will use such returns to repay its debts.

31.    Huayuan New Energy, the Debtor's wholly owned subsidiary, holds a 10% equity stake in Definite Arise, the primary asset of which is a British HPC nuclear power station project involving investment led by China General Nuclear Power Corporation. According to another valuation report published by China Enterprise Appraisal Co., Ltd, as of August 20, 2021, the net appraised value of Huayuan New Energy's interest in Definite Arise is RMB 830,622,220.07 ($130,324,626.33). As Huayuan New Energy has no other substantial obligations, the Debtor expects that payments from any disposal of Huayuan New Energy's equity interest in Definite Arise can be used to repay or satisfy the Debtor's debts and liabilities.

## IV.    **The Plan**

32.    The primary objective of the Plan is to facilitate the implementation of the Financial Restructuring, including with respect to the Notes.

33.    The Plan provides for, among other things:

a.    extension of the maturity of all Ordinary Claims, including both the Affiliated Ordinary Claims as well as those Ordinary Claims of creditors who are not affiliated with the Debtor ("Unaffiliated Ordinary Claims"), from the date on which the Plan is approved by the PRC Court (inclusive of that day) through and including the earlier of (a) five (5) years from the date on which the PRC Court approves the Plan and (b) December 31, 2026 (the "Extended Maturity");

b.    adjustment and alignment of the interest payable on the Unaffiliated Ordinary Claims during the Extended Maturity, such that the same interest rate (4.65% per annum) applies to all such claims;

c.    deferral of part of the interest payable on the Unaffiliated Ordinary Claims until the end of the Extended Maturity, such that part of the 4.65% interest will be payable in cash semi-annually during the Extended Maturity and the balance will be payable on maturity, with the deferred component accruing interest as if it formed part of the outstanding principal amount;

d.    2% per annum default interest applicable on any payment default with respect to the Unaffiliated Ordinary Claims;

e.    new security interests in all of the Debtor's partnership interests in Runliangtai and all of the Debtor's shares in Huayuan New Energy, to be

12

granted in favor of a collateral agent acting for the benefit of the relevant Ordinary Creditors (the "Collateral Agent") to secure repayment of the outstanding amounts on the Unaffiliated Ordinary Claims (excluding the Guaranteed Claims) during the Extended Maturity;

f.      a mandatory obligation on the part of the Debtor to make early repayments (at discounted rates) with respect to part of the outstanding amounts on the Unaffiliated Ordinary Claims (excluding the Guaranteed Claims), if the Debtor realizes cash proceeds from the disposal of certain specified assets;

g.      subordination of those Ordinary Claims that are owed to affiliates of the Debtor, such that those claims will only be repaid upon full repayment of all outstanding amounts on the Unaffiliated Ordinary Claims;

h.      the preservation of existing security interests in connection with the Secured Claims so as to allow the primary debtors (being affiliates of the Debtor) to continue to service and repay those debts; and

i.      the Debtor ceasing to be a defaulting party with respect to both the Notes and the RMB Bonds on and from the date on which the PRC Court approves the Plan, and the subsequent delisting and deregistration of the RMB Bonds.

34.     More specifically, in relation to the Debtor's indebtedness with respect to the Notes

(which form part of the Unaffiliated Ordinary Claims), the Plan provides that:

a.      each Noteholder (including any Noteholder who voted against, or who did not vote on, the Plan) is deemed to have consented to, directed and authorized the following: (i) that amendments be made to the terms of the Indenture, which amendments shall be aligned with the terms of the Plan (the "Notes Amendments"); (ii) that all existing defaults and events of default under the Indenture be waived (the "EOD Waiver"); (iii) the Debtor, the Trustee (including any replacement Trustee), the Collateral Agent, other agents related to the Notes, and all other relevant parties to execute and deliver (including on behalf of the Noteholders) all necessary or appropriate documents to give effect to the Notes Amendments and EOD Waiver (the "Amendment Documents"), including, without limitation, the proposed amended and restated indenture with respect to the Restructured Notes (the "Amended and Restated Indenture"); and (iv) the Tabulation Agent (defined below), as proxy for the Noteholders, passing the Noteholders' voting instructions in respect of the Plan to the Foreign Representative;

b.      the Debtor and each Noteholder irrevocably releases the Trustee (including any replacement Trustee), the Tabulation Agent, and the other agents from any actual or potential liability (other than any liability arising from fraud or willful misconduct) arising out of: the execution and delivery of any Amendment Documents; the transmission by the Tabulation Agent of the

Noteholders' voting instructions on the Plan to the Foreign Representative; and all actions and acts taken or omitted by the Trustee (including any replacement Trustee), the Tabulation Agent, and any other agents in connection with the restructuring of the Notes, amendments to the Indenture, the PRC Proceeding, and/or the Plan (including the EOD Waiver) (the "Releases"); and

c.      following the PRC Court's approval of the Plan, the Foreign Representative shall promptly seek recognition of the same by this Court pursuant to chapter 15 of the Bankruptcy Code and cause the Debtor to execute and deliver all necessary or appropriate Amendment Documents with the Trustee (including any replacement Trustee) and any other relevant parties.

35.      The Plan, and its provisions for the Financial Restructuring, apply to both the Onshore Creditors and the Noteholders.  In particular, with respect to the Unaffiliated Ordinary Claims, the Onshore Creditors (comprising holders of the RMB Bonds and the Other Ordinary Claims) and the Noteholders are to receive substantially the same economic outcomes pursuant to the Plan.  The manner in which the Plan will be implemented, however, will differ between those two groups.  Specifically, while the Onshore Creditors will receive repayments of their claims and interest payments directly pursuant to the Plan, the Noteholders will receive repayments and interest payments pursuant to the Amended and Restated Indenture and the Restructured Notes (which will continue to be traded on the SGX and via the Clearing Systems (as defined below)).  The reason for this divergence is because the Debtor and the Foreign Representative understand that it is of critical importance to the Noteholders that the Restructured Notes continue to be tradeable instruments, whereas ongoing tradability of their debts is not a major concern for Onshore Creditors (including holders of the RMB Bonds).

36.      The Plan is the means by which the Financial Restructuring is to be implemented and will significantly reduce debt service costs, increase liquidity, and facilitate the operation of the Debtor's business in a stable and sustainable manner going forward.  Accordingly, the Plan is in the best interests of the Debtor and its creditors, as it provides creditors with the opportunity to

benefit from the Debtor's turnaround strategy while simultaneously respecting their various contractual and legal rights.

37.     If the Plan becomes effective, it will affect all Plan Creditors.  All Plan Creditors (including those who did not vote in favor of the Plan or those who did not vote at all) will be bound by the terms of the Plan as a matter of PRC law, irrespective of the jurisdiction in which each such Plan Creditor resides or is situated.

## V.     The PRC Proceeding

38.     In June 2021, the Debtor submitted its bankruptcy reorganization application to the PRC Court, pursuant to Article 70 of the Enterprise Bankruptcy Law, on the grounds that the Debtor was unable to pay off its debts when due and was clearly insolvent.  In connection with such application, the Debtor demonstrated to the PRC Court that, despite its current difficulties, it is still meaningful for the Debtor to be reorganized.  On August 20, 2021, the PRC Court accepted the Debtor's bankruptcy reorganization application, thereby commencing the PRC Proceeding (the PRC Court's acceptance of the application, the "Decision").

39.     On September 15, 2021, the PRC Court appointed the Foreign Representative, as Administrator, to monitor the daily operations of the Debtor and to administer the PRC Proceeding and related actions in furtherance of the Debtor's reorganization.  The PRC Court simultaneously designated the Foreign Representative as the "person in charge."  As such, and as more fully set forth in the Decision, the Foreign Representative was empowered to act on behalf of the Debtor and is obliged pursuant to the PRC Court's order appointing it as Administrator to: (a) take over the assets, company seals or chops, books, documents, and other materials of the Debtor; (b) investigate and prepare a report on the financial status of the Debtor; (c) determine the internal management affairs of the Debtor; (d) determine the daily expenses and other necessary expenses of the Debtor; (e) determine whether the Debtor should continue or terminate its operations before

15

convening the first creditors' meeting; (f) manage and distribute the Debtor's assets; (g) participate in lawsuits, arbitration proceedings, and other legal proceedings on behalf of the Debtor; (h) convene creditors' meetings; and (i) perform other duties which, in the opinion of the PRC Court, should be performed by the Foreign Representative, as Administrator. In addition, pursuant to Article 79 of the Enterprise Bankruptcy Law, the Foreign Representative is also required to formulate and submit a draft of a reorganization plan to the PRC Court and the creditors' meeting within six (6) months of the PRC Court's issuance of the Decision (unless extended by the PRC Court).

40.     On December 2, 2021, the Foreign Representative dispatched the notice of the Second Meeting (the "Notice of Meeting") to non-Noteholder creditors (including the Trustee). On December 3, 2021, the Foreign Representative dispatched a copy of the Plan (in Chinese) to the same creditors. When convening a creditors' meeting for the purposes of voting on a reorganization plan, it is common practice for a bankruptcy administrator to only dispatch a copy of the notice of meeting and the draft reorganization plan to the creditors concerned. Pursuant to Article 84 of the Enterprise Bankruptcy Law, the Foreign Representative, as Administrator, gave an explanation of the Plan and answered relevant inquiries from creditors at the Second Meeting.

41.     Separately, with respect to the Noteholders, the Foreign Representative:

a.      caused the Notice of Meeting and an English Translation of the Notice of Meeting to be uploaded onto SGX's website as well as the website maintained by Morrow Sodali as the Debtor's information and tabulation agent (the "Tabulation Agent"), https://bonds.morrowsodali.com/huachen (the "Restructuring Website") on December 3, 2021; and

b.      subsequently, on December 6, 2021, caused a consent solicitation memorandum with respect to the Notes (the "Consent Solicitation Memorandum") to be: uploaded onto SGX's website as well as the Restructuring Website; dispatched to Noteholders via Euroclear Bank SA/NV and/or Clearstream Banking S.A. (the "Clearing Systems"); and sent, by email, to all Noteholders known to the Tabulation Agent.

42.    The Consent Solicitation Memorandum, which was addressed specifically to the Noteholders, explained the terms and effects of the Notes Amendments and how Noteholders can provide electronic voting instructions with respect to the Plan and the Notes Amendments to the Tabulation Agent (to be passed on by the Tabulation Agent to the Foreign Representative) for the purposes of voting on the Plan at or in connection with the Second Meeting.  The Consent Solicitation Memorandum also annexes (among other things) a clean draft of the Amended and Restated Indenture and a redline version of the Amended and Restated Indenture (showing changes made to the existing Indenture).  The Consent Solicitation Memorandum (including its annexes) was only dispatched or made available to Noteholders, and not the other Plan Creditors, because most of its contents (including explanations of the terms of the Restructured Notes and the steps by which the Notes Amendments are to be made and given effect to) are only relevant to Noteholders, and not to the other Plan Creditors.  Further, the Foreign Representative was of the view that dispatching a 500-page long English document to other Plan Creditors (who are mostly PRC-based persons or institutions) will only cause confusion and will not help inform their decision with regards to the Plan.

43.    The Plan and the Consent Solicitation Memorandum also contemplate that the Debtor will seek recognition of the PRC Proceeding and enforcement of the Plan under chapter 15 of the Bankruptcy Code.

44.    The Second Meeting took place on December 17, 2021.  Following the Second Meeting, the Plan Creditors had an additional seven (7) days (until December 24, 2021) to vote on the Plan.  At the Second Meeting, each class of voting creditors present and voting at the Second Meeting voted to approve the Plan.  After receiving the necessary votes in favor of the Plan, the PRC Court convened a panel meeting of three judges to consider approval of the Plan on December

29, 2021, at which meeting the PRC Court approved the Plan.  The Debtor requests that the relief requested herein be heard on February 1, 2022, or as soon as practicable thereafter, subject to the Court's availability.

## BASIS FOR RELIEF

### I.   The Debtor Is Eligible to Be a "Debtor" Under Chapter 15 of the Bankruptcy Code

45.     The Debtor qualifies as a "debtor" as that term is defined in section 1502(a)(1) of the Bankruptcy Code because it is an "entity," which includes corporations.  *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "corporation").  The Debtor is incorporated, with limited liability, in the PRC and is, therefore, a corporation under PRC law.  *See* Liang Declaration ¶ 23.

46.     The Debtor has property in the United States for purposes of being eligible under section 109(a) of the Bankruptcy Code, which requires that a debtor must either reside or have a domicile, a place of business, or property in the United States.  11 U.S.C. § 109(a); *see Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors).  Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it state when or for how long that property must be located within the United States.  *See In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).  Accordingly, courts in this District have required that the debtor have only nominal property in the United States to be eligible to file a chapter 15 case.  *See, e.g.*, *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 293 (Bankr. S.D.N.Y. 2018) ("[C]ourts that have construed the 'property' requirement in Section 109 with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States.") (citation and internal quotation omitted); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as

a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate debtors' bankruptcy proceedings."); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("There is no statutory requirement as to the property's minimum value.").

47.     Here, the Debtor meets the flexible threshold for having property in the United States as required under section 109(a) because it owns the funds in the Retainer Account that are held in New York. *See, e.g.*, *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) ("A debtor's funds held in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in the United States and satisfy the eligibility requirements of section 109(a)."); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372-374 (Bankr. S.D.N.Y. 2014) (noting the "line of authority that support the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States" and holding that cash in a client trust account maintained by U.S. counsel to the foreign representative satisfied section 109(a)).  Moreover, the Debtor is the issuer under the Indenture, which is governed by New York law and contains a New York forum selection clause.  *See, e.g., In re Avanti Communs. Grp. plc*, 582 B.R. at 613 (holding that debt documents governed by New York law and containing New York forum selection clauses satisfied the eligibility requirements under section 109(a)); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (same); *In re Berau*, 540 B.R. at 82-84 (same).  Accordingly, the Debtor is eligible to be a chapter 15 debtor.

## II.     The PRC Proceeding Is a Foreign Main Proceeding

48.     The PRC Proceeding is entitled to recognition as a foreign main proceeding under chapter 15 of the Bankruptcy Code.  Section 1517(a) of the Bankruptcy Code provides that, subject

to section 1506 of the Bankruptcy Code, a court "shall" enter an order granting recognition of a

foreign proceeding if:

>    (1)    such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code;
>
>    (2)    the foreign representative applying for recognition is a person or body; and
>
>    (3)    the petition meets the requirements of section 1515 of the Bankruptcy Code.

11 U.S.C. § 1517(a); *see* H.R. Rep. No. 109-31, pt. 1, at 113 (2005) ("The decision to grant

recognition is not dependent upon any findings about the nature of the foreign proceedings . . .

[t]he requirements of this section... are all that must be fulfilled to attain recognition.").

Section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized .

. . (1) as a foreign main proceeding if it is pending in the country where the debtor has the center

of its main interests." 11 U.S.C. § 1517(b)(1). Here, all of the requirements for recognition of the

PRC Proceeding as a foreign main proceeding are satisfied.

### A.    The PRC Proceeding Constitutes a "Foreign Proceeding"

49.    The PRC Proceeding is a "foreign proceeding" under chapter 15 of the Bankruptcy

Code. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). Based on this definition, courts have held that a "foreign proceeding" is one:

>    a.    in which acts and formalities are set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;
>
>    b.    that has either a judicial or an administrative character;

c.  that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.  that is located in a foreign country;

e.  that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.  in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.  that is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Minechem Ltd.*), 480 B.R. 129, 136 (S.D.N.Y. 2012) (*citing In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525 (Bankr. S.D.N.Y. 2008) (discussing factors).

50.  Courts in this District have previously recognized proceedings under PRC law as foreign proceedings in chapter 15 cases. *See, e.g.*, *In re Reward Science and Technology Industry Group Co., Ltd.*, No. 19-12908 (MEW) [Docket No. 26] (Bankr. S.D.N.Y. Oct. 8, 2019).

51.  The Liang Declaration provides the factual basis to support a finding that the Debtor's PRC Proceeding constitutes a "foreign proceeding" under section 101(23).

52.  *First*, the PRC Proceeding is a proceeding commenced pursuant to Article 13 of the Enterprise Bankruptcy Law, which governs corporate reorganizations and is frequently used in a restructuring context. *See* Liang Declaration ¶¶ 13, Exhibit A. For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *In re Betcorp Ltd.*, 400 B.R. at 278.

53.    *Second*, the proceeding is "judicial," as it is commenced before the PRC Court and thereafter is subject to the supervision of the PRC Court.  *See* Liang Declaration ¶¶ 13–22.  The PRC Court entered an order commencing the PRC Proceeding on August 20, 2021, and the Plan must be approved by the PRC Court for it to be effective.  *See* Liang Declaration ¶¶ 19–22, 51. Therefore, the PRC Proceeding is a "judicial" proceeding.  *See In re ABC Learning Ctrs. Ltd.,* 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd,* 728 F.3d 301 (3rd Cir. 2013) (a proceeding is judicial when a "[c]ourt exercises its supervisory powers.").

54.    *Third*, the PRC Proceeding is collective in nature, as it affects all Plan Creditors and generally requires approval by a majority in number of the voting Plan Creditors in each voting class representing at least two-thirds in value of debts held by Plan Creditors belonging to that voting class in order for the Plan to become effective.  *See* Liang Declaration ¶¶ 20–21.  The Plan is intended to benefit creditors based on their collective rights, rather than to benefit any single creditor alone.  *Id*. ¶ 21.  Accordingly, the Plan is collective in nature.  *See In re Betcorp*, 400 B.R. at 281 (a proceeding is collective where it "considers the rights and obligations of all creditors" in contrast to a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor"); *see also In re Poymanov*, 571 B.R. at 33 (Bankr. S.D.N.Y. 2017) ("A proceeding is collective if it considers the rights and obligations of all of a debtor's creditors, rather than a single creditor.").

55.    *Fourth*, the PRC Proceeding is being administered by the PRC Court in Beijing, PRC, which is a foreign country.  *See* Liang Declaration ¶¶ 1, 51.

56.    *Fifth*, the PRC Proceeding is administered under the Enterprise Bankruptcy Law, which is a PRC law that governs, among other things, the adjustment of creditors' rights and the Debtor's liabilities, as contemplated by the Plan that the Debtor is seeking to implement with the

approval of the PRC Court.  *See* Liang Declaration ¶ 13, Exhibit A.  Therefore, the PRC Proceeding

is conducted under a law related to insolvency or the adjustment of debt.  *See In re Millard*, 501

B.R. 644, 649-50 (Bankr. S.D.N.Y. 2013) ("[t]he words 'under a law relating to insolvency or

adjustment of debt' [in section 101(23)] emphasize that chapter 15 is available not only to debtors

that are technically insolvent or facing liquidation, but also to debtors who are in financial distress

and may need to reorganize."); *see also In re Avanti Commus. Grp. plc*, 582 B.R. at 614 ("The

[proceeding] is pending in a foreign country under a law that allows companies to effectuate

binding compromises or arrangements . . . and is therefore an 'adjustment of debt.'").

57.     *Sixth*, pursuant to Article 13 of the Enterprise Bankruptcy Law and Article 21 of

the Provisions of the Supreme People's Court on Designation of Administrators During the Trial

of Enterprise Bankruptcy Cases, the Debtor's assets and affairs are subject to the control of the

Foreign Representative, who has been and shall continue to be supervised by the PRC Court for

the duration of the PRC Proceeding.  *See* Liang Declaration ¶¶ 1–2, 51-52.  The PRC Court thus

has control over the Debtor's assets and affairs through the PRC Proceeding.

58.     *Seventh*, the objective of the PRC Proceeding is reorganization, as the PRC

Proceeding will enable the Debtor to right size its balance sheet through a restructuring of its

obligations under the Notes.  *Id.* ¶¶ 45–50; *see In re Overnight & Control Comm'n of Avánzit,

S.A.*, 385 B.R. at 533-34 (recognizing a "financial restructuring" as a "reorganization" for purposes

of the sections 101(23) and 1517 analysis).

59.     Accordingly, the Foreign Representative respectfully requests that the Court find

that the PRC Proceeding constitutes a "foreign proceeding."

**B.     The PRC Proceeding Is a "Foreign Main Proceeding"**

60.     The PRC Proceeding also qualifies as a "foreign main proceeding," which is

defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor

has the center of its main interests." 11 U.S.C. § 1502(4). The relevant time period to determine the location of a debtor's "center of main interests" ("COMI") is the date on which the chapter 15 petition is filed. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

61.     While the Bankruptcy Code does not expressly define "COMI," it provides that, in the absence of evidence to the contrary, a debtor's registered office is presumed to be its COMI. *See* 11 U.S.C. § 1516(c); *see also In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012); *In re Tri-Continental Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) ("In effect, the registered office . . . is evidence that is probative of, and that may in the absence of other evidence be accepted as proxy for, 'center of main interest.'"). Here, the Debtor's registered office is located in Beijing, PRC. *See* Liang Declaration ¶ 27. Accordingly, the Debtor is entitled to the statutory presumption that its COMI is located in PRC.

62.     In addition, courts consider the following factors relevant to the determination of a debtor's COMI:

> the location of the debtor's headquarters; the location of those who actually manage the debtor...; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 654 (Bankr. S.D.N.Y. 2016) (internal citations omitted); *see In re Fairfield Sentry Ltd.*, 714 F.3d at 130 ("Among other factors that may be considered [in determining COMI] are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes."); *In re Avanti Communs. Grp. plc*, 582 B.R. at 614 (concluding that the UK constituted the debtor's "center of main interests" where "the Debtor is incorporated in the UK and its registered offices and headquarters are in London.").

63.     Under all of the relevant criteria, the Debtor's COMI is located in the PRC.  The Debtor's registered office and headquarters are located in the PRC, as are the Debtor's senior management and all of its non-managerial employees.  *See* Liang Declaration ¶ 27.  All of the Debtor's key corporate activities occur in the PRC, and its books and records are located in the PRC.  *Id*.  The Debtor's debt documents and other public filings made by the Debtor typically state that the Debtor is incorporated in the PRC and that its registered office is located in the PRC.  *Id*.

64.     Accordingly, the Debtor's COMI in the PRC is well-known and readily ascertainable by third parties.  *See In re Fairfield Sentry Ltd.*, 714 F.3d at 130 ("The relevant principle [to determine a debtor's COMI] is that COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties...."); *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015) (chapter 15 debtor's COMI was readily ascertainable as Brazil, among other reasons, because note purchasers understood that their investment was in a Brazil-based business and expected to receive payment from cash generated by a Brazilian entity).  As the PRC Proceeding is pending in the Debtor's COMI, the PRC Proceeding should be recognized as a foreign main proceeding.

## III.   The Foreign Representative Satisfies the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code

65.     For recognition under chapter 15, a foreign proceeding must also have a foreign representative.  *See* 11 U.S.C. § 1517(a)(2).  The Foreign Representative submits that this Chapter 15 Case was commenced by a duly appointed and authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.  Section 101(24) of the Bankruptcy Code provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the

25

> liquidation of the debtor's assets or affairs or to act as a
> representative of such foreign proceeding.

11 U.S.C. § 101(24).

66.     Moreover, the Debtor has commenced the PRC Proceeding, and the PRC Court has

approved the appointment of the Foreign Representative in the order entered by the PRC Court on

September 15, 2021.  *See* Liang Declaration ¶ 52.  Thus, the Foreign Representative has met the

requirements of section 101(24) of the Bankruptcy Code and is the Debtor's "foreign

representative" as defined thereunder.  *See In re SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr.

S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (noting that the foreign representatives had

submitted a "copy of the Cayman Court's order appointing them to administer the Debtors'

winding up under the Companies Law and authorizing their commencement of these chapter 15

cases, thereby satisfying Bankruptcy Code sections 101(24) and 1515(c).").

## IV.     The Petition Was Properly Filed and Satisfies the Requirements of Section 1515 of the Bankruptcy Code

67.     The Foreign Representative duly and properly commenced this Chapter 15 Case in

accordance with sections 1504 and 1509 of the Bankruptcy Code, which require the filing of a

petition for recognition under section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. §§ 1504,

1509(a).    In accordance with section 1515(b)(1) of the Bankruptcy Code, the Foreign

Representative attached to the Form of Voluntary Petition certified copies of the materials

commencing the PRC Proceeding and appointing the Foreign Representative, as Administrator,

with respect thereto.  In accordance with section 1515(c) of the Bankruptcy Code, the Foreign

Representative also submitted a declaration attached to the Form of Voluntary Petition containing

a statement identifying the PRC Proceeding as the only known pending "foreign proceeding" with

respect to the Debtor.  Accordingly, the requirements of section 1515 have been satisfied.

26

## V.    The Debtor Is Entitled to Automatic Relief under Section 1520 of the Bankruptcy Code

68.    Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property located within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a).

69.    Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517 of the Bankruptcy Code, the Foreign Representative respectfully submits that no further showing is required to the extent the Court recognizes the PRC Proceeding as a foreign main proceeding.

## VI.    Certain Additional Relief Upon Recognition Is Both Necessary and Appropriate to Implement the PRC Proceeding and Should Be Granted

70.    In addition to recognition of the PRC Proceeding as a foreign main proceeding, the Foreign Representative submits that any relief sought in the Petition that does not flow automatically from section 1520(a), including (a) enforcement of the Approval Order, as well as the Plan and the Releases contained therein, within the territorial jurisdiction of the United States and (b) approval of the Injunction, is authorized under sections 105(a), 1507, and 1521 of the Bankruptcy Code and is consistent with well-established principles of international comity.

71.    Chapter 15 of the Bankruptcy Code empowers "courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity." *In re Rede Energia S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333-34 (S.D.N.Y. 2008)); *see In re SPhinX, Ltd.*, 351 B.R. at 112 ("chapter 15 maintains – and in some respects enhances – the 'maximum flexibility' . . . that section 304 provided bankruptcy courts in

handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.") (internal citations omitted); *see also* 11 U.S.C. § 1501 (stating that the purpose of chapter 15 is to provide mechanisms for cooperation and comity between courts dealing with cross-border insolvency cases). As this Court has explained:

> While recognition of the foreign proceeding turns on the objective criteria under § 1517, relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity. Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with the principles of comity.

*In re Sino-Forest Corp.*, 501 B.R. 655, 664 (Bankr. S.D.N.Y. 2013) (internal citations and quotations omitted). Here, the Court should exercise its discretion under sections 1507 and 1521 of the Bankruptcy Code, consistent with the principles of comity, to recognize and enforce the Plan, including the Releases, and to approve the Injunction.[7] *See, e.g.*, *In re Avanti Communs. Grp. plc*, 582 B.R. at 616 ("Cases have held that in the exercise of comity that appropriate relief under section 1521 or additional assistance under section 1507 may include recognizing and enforcing a foreign plan confirmation order.").

## A.   The Plan and the Approval Order Should Be Recognized and Enforced

### 1.   Recognition and Enforcement of the Plan and the Approval Order Is Warranted Under Section 1521 of the Bankruptcy Code

72.   Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors[,]" including any relief that may be available to a trustee or debtor-

---

[7]   The relief requested herein is also consistent with section 1525(a) of the Bankruptcy Code, which provides that "[c]onsistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee." 11 U.S.C. § 1525(a).

in-possession, subject to certain exceptions that do not apply here.  11 U.S.C. § 1521(a); *In re Daebo Int'l Shipping Co., Ltd.*, 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015); *Hosking v. TPG Capital Mgmt. (In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543, 586 (Bankr. S.D.N.Y. 2015) ("a foreign representative may obtain relief available to a trustee under the Bankruptcy Code...."); *see also In re ABC Learning Centres Ltd.*, 728 F.3d at 306 ("Foreign Representatives can access U.S. courts to request enforcement of orders of the foreign proceeding and to stay actions against foreign debtors' property in the United States."); *In re Energy Coal S.P.A.*, 582 B.R. 619, 628 (Bankr. D. Del. 2018) ("Section 1521 contains a non-exhaustive list of types of relief that may be appropriate in a given proceeding.").

73.     Recognition and enforcement of the Plan and the Approval Order is "appropriate relief" under section 1521(a) of the Bankruptcy Code because that relief is necessary to ensure that the Plan can be implemented without disruption or adverse actions being brought against the Debtor or its assets in the United States.  Specifically, enforcement of the Plan, including the Releases contained therein, and the Approval Order is appropriate because, *first*, such enforcement is a condition which must be satisfied before the Trustee will execute the Amendment Documents to give effect to the Notes Amendments (and, by extension, the Financial Restructuring with respect to the Notes) and, *second*, certain Noteholders may seek to obtain judgments in the United States against the Debtor under the Indenture to obtain better treatment than they will receive under the Plan.  If those Noteholders (who are themselves Plan Creditors) can effectively evade the terms of the Plan by commencing actions in the United States, the purpose of the Plan could be thwarted, and the Debtor would be required to defend those proceedings at considerable expense to the Debtor and its other creditors.

74.     Courts in this District and elsewhere routinely grant recognition and enforcement of foreign court orders approving a foreign debtor's restructuring. *See, e.g.*, *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 167-68 (3d Cir. 2018) (affirming bankruptcy court order enforcing releases in foreign debtor's Canadian plan of arrangement); *In re Avanti Communs. Grp. plc*, 582 B.R. at 619 (recognizing and enforcing UK restructuring and order of English court sanctioning same); *In re Cell C Proprietary Ltd.*, 571 B.R. at 554 (recognizing and enforcing order of South African Court sanctioning a restructuring); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018) (recognizing and enforcing UK restructuring and order of English court sanctioning same); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018) (same); *In re Ocean Rig UDW Inc.*, No. 17-10736 (MG) [Docket No. 153] (Bankr. S.D.N.Y. Sept. 20, 2017) (recognizing and enforcing Cayman restructurings and orders of Cayman court sanctioning same); *In re Boart Longyear Ltd.*, No. 17-11156 (MEW) [Docket No. 45] (Bankr. S.D.N.Y. Aug. 30, 2017) (recognizing and enforcing order of Supreme Court of New South Wales sanctioning Australian restructurings); *In re EnQuest PLC*, No. 16-12983 (MEW) [Docket No. 14] (Bankr. S.D.N.Y. Nov. 17, 2016) (recognizing and enforcing UK restructurings and UK orders sanctioning the same); *In re YH Ltd.*, No. 16-12262 (SCC) [Docket No. 14] (Bankr. S.D.N.Y. Sept 8, 2016) (recognizing and enforcing UK restructuring and order of English court sanctioning same).

75.     Further, the Releases are an integral part of the Plan and are consistent with PRC law.  Moreover, courts in this District and elsewhere routinely enforce third-party releases in

foreign proceedings.[8] *See, e.g.*, *In re Arctic Glacier Int'l, Inc.*, 901 F.3d at 167-68; *In re Avanti Communs. Grp. plc*, 582 B.R. at 618 (recognizing and enforcing UK restructuring and sanction order that provided third-party non-debtor guarantor releases); *In re Ocean Rig UDW Inc.*, 570 B.R. at 702 (recognizing and enforcing restructuring that released affiliate guarantees); *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party releases); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case."); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019) (recognizing and enforcing UK restructuring and sanction order that provided third-party releases); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018) (same); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018) (same).

76.    Here, the Releases pertain to claims of the Debtor and the Noteholders against the Trustee (including any replacement Trustee), the Tabulation Agent, the Collateral Agent, other agents related to the Notes, and all other relevant parties in connection with the execution and delivery of any Amendment Documents; the transmission by the Tabulation Agent of the Noteholders' voting instructions on the Plan to the Administrator; and all actions and acts taken or

---

[8]    The Foreign Representative is aware of the recent ruling in the Purdue Pharma L.P. cases in the District Court for the Southern District of New York, in which the court found that the non-consensual third-party releases at issue in Purdue Pharma L.P.'s chapter 11 plan are not authorized under the Bankruptcy Code.  However, the Foreign Representative submits that the Releases in the Plan are narrowly tailored, comply with applicable PRC law, and are not manifestly contrary to United States public policy, and therefore, the Plan, including the Releases, should be enforced within the territorial jurisdiction of the United States.

omitted by the Trustee (including any replacement Trustee), the Tabulation Agent and other agents in connection with the restructuring of the Notes, amendments to the Indenture, the PRC Proceeding, and/or the Plan (including the EOD Waiver). *See* Liang Declaration ¶ 47. The Releases are consistent with the types of releases and exculpations that are generally provided (and approved) in chapter 11 cases. The only non-Debtor parties giving the Releases under the Plan are the Noteholders, and those Releases have been approved by the PRC Court's Approval Order, which followed approval of the Plan by the Plan Creditors (including the Noteholders). *See* Liang Declaration ¶¶ 45–50. The Releases, therefore, are tailored to achieve the purpose of the Plan—to facilitate the Financial Restructuring.

77.    The Foreign Representative, therefore, respectfully requests that the Court recognize and enforce the Plan, including the Releases contained therein, to ensure that the Plan is successfully implemented across jurisdictions, including the United States.

## 2.    Recognition and Enforcement of the Plan and the Approval Order Is Also Authorized Under Section 1507 of the Bankruptcy Code

78.    The Court may also grant relief pursuant to section 1507 of the Bankruptcy Code, which authorizes the Court to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law at any time after recognition. *See* 11 U.S.C. § 1507(a). Recognition and enforcement of the Approval Order is authorized as "additional assistance" under section 1507 of the Bankruptcy Code. Under section 1507(b) of the Bankruptcy Code, in considering a request for additional assistance consistent with principles of comity, the Court also considers whether the requested relief will ensure:

> (1)    just treatment of all holders of claims against or interests in the debtor's property;
>
> (2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3)    prevention of preferential or fraudulent dispositions of property of the debtor;

(4)    distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5)    if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

79.    The Foreign Representative submits that the additional assistance sought here does not run afoul of any of the principles set forth in section 1507(b) of the Bankruptcy Code. Section 1507(b)(1) is satisfied because the Bankruptcy Enterprise Law provides a comprehensive procedure for the orderly compromise of claims with equal application to all Plan Creditors. *See* Liang Declaration ¶¶ 19–21; *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) (*quoting* 2 COLLIER ON BANKRUPTCY ¶ 304.08 (15th ed. 2007) ("The just treatment factor is satisfied upon a showing that the applicable law provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors.")). Section 1507(b)(2) is satisfied because the Plan does not create additional burdens for U.S. holders of Notes.  Section 1507(b)(3) is inapplicable because there are no preferential or fraudulent dispositions of property.

80.    Section 1507(b)(4) is satisfied because the Plan provides for equal treatment of all Plan Creditors belonging to the same class, subject only to limited exceptions.  With respect to the class of Ordinary Creditors, with the exception of Affiliated Ordinary Claims and Guarantee Claims (which represent secondary, as opposed to primary, debt obligations of the Debtor), the other Ordinary Creditors are treated equally.  More specifically, the Notes Amendments are consistent with the Plan such that both the Noteholders on the one hand, and holders of the RMB Bonds and the Other Ordinary Claims on the other, will receive the same economic outcomes

33

under the Plan and Restructured Notes respectively, albeit in different forms—one in the form of a claim against the Debtor under the Plan and the other in the form of a tradable instrument on terms consistent with the Plan. *See* Liang Declaration ¶ 48. With respect to the Secured Creditors, their Secured Claims will not be extended or otherwise compromised under the Plan. Such differential treatment of Secured Creditors and Ordinary Creditors is substantially similar to the treatment that separate classes would receive under chapter 11. *See Telecom Arg.*, 528 F.3d at 170 n.9 (noting that "the priority rules of a foreign jurisdiction need not be identical to those of the United States") (*citing Schimmelpenninck v. Byrne* (*In re Schimmelpenninck*), 183 F.3d 347, 364 (5th Cir. 1999)); *In re Rede Energia S.A.*, 515 B.R. at 97; *In re Manning*, 236 B.R. 14, 25 (9th Cir. B.A.P. 1999) (citation omitted). Importantly, to approve the Plan (which the PRC Court did approve), the PRC Court must find that the creditors were fairly represented and that Plan Creditors' approval of the Plan was reasonable. *See* Liang Declaration ¶ 21. Accordingly, the distributions under the Plan are consistent with U.S. law. Section 1507(b)(5) is inapplicable because the Debtor is not an individual.

### 3. The Plan and the Approval Order Are Entitled to Recognition and Enforcement As a Matter of Comity

81.     In determining whether to recognize and enforce a foreign judgment, courts also consider general comity principles. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 698 (*citing Hilton v. Guyot*, 159 U.S. 113, 166 (1895); *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F. Supp. 609, 615 (S.D.N.Y. 1991)). In *Hilton v. Guyot*, the Supreme Court held that if the foreign court provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and

there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the foreign judgment should be enforced and not "tried afresh." *Hilton*, 159 U.S. at 202-03.

82.    "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) (citations omitted); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico S.A.*, 412 F.3d 418, 424 (2d Cir. 2005) ("[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and... do not contravene the laws or public policy of the United States."); *Universal Cas. & Sur. Co. v. Gee (In re Gee)*, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (noting that if the bankruptcy court is satisfied with the procedural fairness of the foreign proceeding, it "should not sit as an appellate court over the foreign proceedings.").

83.    Extending comity to orders confirming foreign plans of reorganization is particularly significant given the importance of "assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Atlas Shipping*, 404 B.R. at 737 (internal citation omitted); *see also Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").

84.    "[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of [provisions in foreign court orders], even if those provisions could not be entered in a plenary chapter 11 case." *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 696.  The "relief granted in [a] foreign proceeding and

the relief available in a U.S. proceeding need not be identical[,]" and U.S. bankruptcy courts are "not required to make an independent determination about the propriety of individual acts of a foreign court." *Id*. at 697 (*citing In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391 (Bankr. S.D.N.Y. 2004)). Rather, "[a]s long as the manner in which the [restructuring] acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it." *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25, 56–61 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (citations omitted).

85.     Here, all Plan Creditors had a full and fair opportunity to vote on the Plan at or in connection with the Second Meeting, in each case, after ample notice and adequate disclosure of the Plan terms. *See* Liang Declaration ¶¶ 53–55. Specifically, on December 2 and 3, 2021, the Foreign Representative made, respectively, the Notice of Meeting and the Plan (both in Chinese) available to non-Noteholder Plan Creditors (including the Trustee). Because of the specific procedures applicable to voting by the Noteholders, and because of the additional steps involved in implementing the Notes Amendments, which procedures and steps are not applicable to the other Plan Creditors, a special set of documents, including the Consent Solicitation Memorandum, the Plan (and its English translation), the Notice of Meeting (and its English translation), and the draft Amended and Restated Indenture were made available to the Noteholders on the Restructuring Website and the SGX website on and from December 6, 2021, and were also dispatched to all known Noteholders via the Clearing Systems and via email. The Consent Solicitation Memorandum provided detailed information on the effects of the Plan and the Notes Amendments to enable those Plan Creditors to make a reasonable decision about whether to vote in favor of the Plan and consent to the Notes Amendments.

86.    All Plan Creditors (including the Noteholders, via the Tabulation Agent as their proxy) had the right to vote on the Plan at or in connection with the Second Meeting convened by order of the PRC Court.  Liang Declaration ¶¶ 20–21, 53–55.  The Plan has been approved by a majority in number (*i.e.*, more than 50%) representing at least two-thirds in value of Plan Creditors in each voting class voting at or in connection with the Second Meeting.  *Id.*  ¶ 20.  The PRC Court retained independent and final authority to review and approve the Plan before implementation, and the PRC Court approved the Plan on December 29, 2021 as noted herein.  *Id.* ¶ 21.  All creditors have had a full and fair opportunity to be heard in the PRC Proceeding under a sophisticated insolvency regime before an impartial court in accordance with fundamental standards of due process.  Accordingly, the Court should recognize and enforce the Plan (including the Releases) and the Approval Order, consistent with the principles of comity.

> **4.    Recognition of the Plan and Approval Order, Including the Releases, Comports with the Bankruptcy Code and Is Consistent with U.S. Public Policy**

87.    Although section 1506 places a limitation on relief available under chapter 15 if such relief is manifestly contrary to U.S. public policy, this exception is narrowly construed.  *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 697 (*citing In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333 (S.D.N.Y. 2006)); *see also In re Poymanov*, 571 B.R. at 38 (noting that the public policy exception "is to be applied sparingly"); *In re OAS S.A.*, 533 B.R. at 103 (recognizing that the public policy exception "requires a narrow reading") (internal citation and quotations omitted).  "[T]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 697 (internal citation omitted).

88.     Nothing in the Plan (including the Releases) or the Approval Order is manifestly contrary to U.S. public policy.[9]  The Plan provides for a comprehensive resolution of the Debtor's debt obligations.  This result is substantially similar to the result that would be achieved under the Bankruptcy Code.  The PRC Court's exercise of jurisdiction over, and supervision of, the Debtor was proper under the Enterprise Bankruptcy Law, which provides for a fundamentally fair process that "accords with the source of civilized jurisprudence."  *In re Rede Energia*, 515 B.R. at 98.  And this Court has repeatedly held that third-party releases in foreign restructuring plans are not manifestly contrary to public policy.  *See, e.g., In re Avanti Communs. Grp. plc*, 582 B.R. at 618 ("[Restructurings] sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code."); *In re Sino-Forest Corp.*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy").  Accordingly, the public policy exception does not apply.

### B.     Granting a Permanent Injunction Is Necessary to Enforce the Plan and the Approval Order

89.     To the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code, the Foreign Representative also seeks the Injunction to prevent any parties from attempting to continue or commence actions or assert claims in the United States against the Debtor or its property inconsistent with the Plan or the Approval Order.  The Injunction requested herein is necessary to ensure that the Plan can be implemented successfully and will ensure that no party may take actions adverse to the Debtor or its property located within the territorial jurisdiction of

---

[9]  For the avoidance of doubt, the Foreign Representative respectfully submits that the Releases under the Plan are distinguishable from the non-consensual third-party releases at issue in the Purdue Pharma L.P. bankruptcy cases, which are the subject of ongoing litigation in the Southern District for New York.

the United States in an effort to gain an unfair advantage over other parties in interest subject to the Plan.

90.    This Court has the authority to grant the Injunction in this Chapter 15 Case. *See, e.g.*, *Can. S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883) (actions brought in the United States by bondholders who did not participate in the Canadian insolvency proceedings of a Canadian railroad could not be maintained, even though the bonds were payable in New York); *In re Arctic Glacier Int'l, Inc.*, 901 F.3d at 167-68 (giving *res judicata* effect to releases under foreign plan of arrangement); *In re Avanti Communs. Grp. plc*, 582 B.R. at 619 (permanently enjoining any action inconsistent with UK restructuring, including releases, and order of English court sanctioning same); *In re Energy Coal S.P.A.*, 582 B.R. at 628 (permanently enjoining collection or enforcement actions against the debtor in connection with recognition and enforcement of Italian plan and homologation order); *In re CGG S.A.*, 579 B.R. 716, 720 (Bankr. S.D.N.Y. 2017) (granting permanent injunctive relief in respect of French plan and order of French court approving same); *In re Metcalfe & Mansfield Alternative Inv.*, 421 B.R. at 700 (granting permanent injunctive relief in chapter 15 case in respect of Canadian plan); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019) (permanently enjoining any action inconsistent with UK restructuring, including releases); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018) (same); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018) (same); *In re YH Ltd.*, No. 16-12262 (SCC) [Docket No. 14] (Bankr. S.D.N.Y. Sept 8, 2016) (same).[10]

---

[10] *See also In re Ocean Rig UDW Inc*., No. 17-10736 (MG) [Docket No. 153]; *In re Boart Longyear Ltd*., No. 17-11156 (MEW) [Docket No. 45] (Bankr. S.D.N.Y. Aug. 30, 2017); *In re Abengoa, S.A*., No. 16-10754 (KJC) [Docket No. 169] (Bankr. D. Del. Dec. 8, 2016); *In re Groupo Isolux Corsán, S.A*., No. 16-12202 (SHL) [Docket No. 50] (Bankr. S.D.N.Y. Nov. 17, 2016); *In re Pac. Expl. & Prod. Corp*., No. 16-11189 (JLG) [Docket No. 31] (Bankr.

91.    The standards, procedures, and limitations applicable to an injunction apply to relief sought under section 1521(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 1521(e).  Generally, to obtain a permanent injunction, a movant must demonstrate the likelihood of irreparable harm.  *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).  Irreparable harm in the chapter 15 context may exist if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors.  *See, e.g.*, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714-15 (2d Cir. 1987); *In re CGG S.A.*, 579 B.R. at 720 (permanent injunctive relief in respect of French plan was "warranted under section 1521(e) of the Bankruptcy Code to prevent any parties from gaining an unfair advantage over other parties in interest subject to the [foreign plan]."); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (quoting COLLIER ON BANKRUPTCY ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); *In re Petition of Brierley*, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from the failure to grant injunctive relief in the form of disruption of an orderly determination of claims and the fair distribution in a single case.") (internal citation and quotations omitted).

---

S.D.N.Y. Oct. 3, 2016); *In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. Nov. 17, 2016) [Docket No. 14]; *In re Winsway Enters. Holdings Ltd.*, No. 16-10833 (MG) [Docket No. 22] (Bankr. S.D.N.Y. June 16, 2016); *In re Zlomrex Int'l Financing S.A*., No. 13-14138 (SHL) [Docket No. 17] (Bankr. S.D.N.Y. Jan. 31, 2014); *In re BTA Bank JSC*, No. 12-13081 (JMP) [Docket No. 20] (Bankr. S.D.N.Y. Jan. 3, 2013); *In re Highlands Ins. Co.* (U.K.) Ltd., No. 07-13970 (MG) [Docket No. 40] (Bankr. S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4*, Ltd., No. 09-11761 (REG) [Docket No. 25] (Bankr. S.D.N.Y. May 7, 2009); *In re Gordian RunOff (UK) Ltd*., No. 06-11563 (RDD) [Docket No. 14] (Bankr. S.D.N.Y. Aug. 29, 2006).

92.     The risk of irreparable harm exists here because dissenting creditors may seek judgments in the United States against the Debtor and any property located in the United States in an effort to obtain more than the *pro rata* treatment to which they are entitled under the Plan.  As stated above, the Indenture is governed by New York law and contains a New York forum selection clause.  Implementation of the Plan and the Notes Amendments is central to the success of the Financial Restructuring of the Debtor.  If Noteholders could effectively circumvent the terms of the Plan by commencing actions in the United States, the purpose of the Plan could be undermined, and the Debtor would be left to defend against these lawsuits, however meritless, which would be a tremendous waste of time and resources.  Those collateral attacks could also jeopardize the successful implementation of the Plan.  The Injunction will help to ensure the fair and efficient implementation of the Plan and to bind all of the Debtor's creditors (including the Noteholders) to the terms of the Plan, as approved by the Approval Order.

93.     Absent permanent injunctive relief, the Debtor's efforts to effect the Financial Restructuring and achieve successful reorganization could be thwarted by the actions of dissenting creditors, a result that is inconsistent with the Bankruptcy Code.  The interests of affected parties under the Plan are sufficiently protected under section 1522(a) of the Bankruptcy Code by the treatment afforded to them in the PRC Proceeding because all similarly situated parties will be treated equally and fairly.  The Injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors and is consistent with principles of comity.  Accordingly, the Injunction should be granted.

## VII.    Waiver of the Stay Is Appropriate to Ensure Expeditious Implementation of the Plan

94.     The Foreign Representative respectfully requests that, to the extent applicable, the Court cause the Proposed Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness of the order imposed by operation of the Bankruptcy Code or the

Bankruptcy Rules, including Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014.  Such a waiver is appropriate in these circumstances to allow the Debtor to proceed immediately with consummation of the Notes Amendments.  *See* Liang Declaration ¶ 58.  Now that the PRC Court has approved the Plan, the Plan will be immediately implemented with respect to the Plan Creditors (other than the Noteholders).  Meanwhile, any delay in the Proposed Order becoming effective will mean a corresponding delay in implementing the Plan with respect to the Noteholders.  Delays in implementing the Plan with respect to the Noteholders (which represent an important constituent of the Plan Creditors) could result in unfair outcomes as between the Debtors' creditors.  *See id.* For these reasons and in light of the high degree of creditor support for the Plan, granting a waiver of the 14-day stay of effectiveness period is appropriate so that the Plan can be implemented as soon as possible.

95.    Courts in this District routinely provide full or partial waivers of the 14-day stay of effectiveness period in chapter 15 cases.  *In re DTEK Finance PLC*, No. 21-10735 (JLG) [Docket No. 15], *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019); *In re Lehman Brothers Int'l (Europe)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018); *In re Avanti Communs. Grp. plc*, No. 18-10458 (MG) [Docket No. 15] (Bankr. S.D.N.Y. Apr. 6, 2018); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018); *In re CGG S.A.*, No. 17-11636 (MG) [Docket No. 25] (Bankr. S.D.N.Y. Dec. 21, 2017); *In re Boart Longyear Ltd.*, No. 17-11156 (MEW) [Docket No. 45] (Bankr. S.D.N.Y. Aug. 30, 2017); *In re Pac. Expl. & Prod. Corp.*, No. 16-11189 (JLG) [Docket No. 31] (Bankr. S.D.N.Y. Oct. 3, 2016); *In re Landsbanki Islands HF.*, No. 08-14921 (RDD) [Docket No. 65] (Bankr. S.D.N.Y. Mar. 17, 2016); *In re Metcalfe &*

*Mansfield Alternative Invs.*, No. 09-16709 (MG) [Docket No. 28] (Bankr. S.D.N.Y. Jan. 5, 2010);

*In re Quebecor World Inc.*, No. 08-13814 (JMP) [Docket No. 12] (Bankr. S.D.N.Y. July 1, 2009).

## NOTICE

96.    In accordance with Bankruptcy Rule 2002(q), the Foreign Representative has provided notice of this Petition by first class mail or email to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Ad Hoc Committee; (c) the Trustee; (d) the Plan Creditors (including the Noteholders); and (e) all parties that have filed a notice of appearance in this Chapter 15 Case.  The Foreign Representative submits that no other or further notice of this Petition is necessary or required.

## NO PRIOR REQUEST

97.    No prior request for the relief sought in this Petition has been made to this or any other court.


[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the Foreign Representative respectfully requests entry of the Proposed

Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein

and such other and further relief as is just and proper.

Dated: January 4, 2022                Respectfully submitted,
New York, New York

/s/ Caroline A. Reckler
Caroline A. Reckler
Jonathan J. Weichselbaum (*pro hac vice*
pending)
Alexandra M. Zablocki (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  caroline.reckler@lw.com
jon.weichselbaum@lw.com
alexandra.zablocki@lw.com

– and –

Jeramy D. Webb (*pro hac vice* pending)
Andrew J. Miller (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email:  jeramy.webb@lw.com
andrew.miller@lw.com

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Huachen Energy Co., Ltd.,[1] | Case No. 22-10005 (LGB) |
| Debtor in a Foreign Proceeding. | |

<u>**STATEMENT OF VERIFICATION**</u>

Pursuant to 28 U.S.C. § 1746, Minhai Liang hereby declares as follows under penalty of perjury:

1.      I am an authorized representative of Ernst & Young Hua Ming LLP (in its capacity as Administrator of the Debtor), the Debtor's duly authorized foreign representative.  I am duly authorized to file this Petition on behalf of the Foreign Representative and to commence and act in this Chapter 15 Case.

2.      I have read the foregoing Petition and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

3.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 4, 2022                               */s/ Minhai Liang*
       Beijing, People's Republic of China        Minhai Liang, Authorized Representative
                                         Ernst & Young Hua Ming LLP

---

[1]  The last four digits of the Debtor's Unified Social Credit Code are 6704.  The location of the Debtor's registered office is 3/F, Building 4, Guoxingjiayuan, No. 20 Shouti South Road, Haidian District, Beijing, People's Republic of China.

**<u>Exhibit A</u>**

**Proposed Recognition Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Huachen Energy Co., Ltd.,[1] | Case No. 22-10005 (LGB) |
| Debtor in a Foreign Proceeding. | |

## [PROPOSED] ORDER RECOGNIZING
## FOREIGN PROCEEDING AND GRANTING RELATED RELIEF

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* [Docket No. 2] (the "Verified Petition")[2] of Ernst & Young Hua Ming LLP, in its capacity as the duly authorized foreign representative (the "Foreign Representative") of Huachen Energy Co., Ltd. (the "Debtor"), which is the subject of a bankruptcy reorganization proceeding under PRC law (the "PRC Proceeding") currently pending before the No. 1 Intermediate People's Court of Beijing (the "PRC Court") under Article 71 of the Enterprise Bankruptcy Law of the People's Republic of China (the "Enterprise Bankruptcy Law"), in support of entry of an order:

      a.      finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), (ii) the PRC Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

      b.      granting recognition of the PRC Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

---

[1]  The last four digits of the Debtor's Unified Social Credit Code are 6704.  The location of the Debtor's registered office is 3/F, Building 4, Guoxingjiayuan, No. 20 Shouti South Road, Haidian District, Beijing, People's Republic of China.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

c.       granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

d.       recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the PRC Proceeding, the Plan and the order of the PRC Court approving the Plan (the "Approval Order"), including giving effect to the releases set forth in the Plan (the "Releases");

e.       permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Plan (the "Injunction");

f.       directing the Debtor, the Trustee (including any replacement trustee, as may be applicable), and any other relevant party to execute and deliver all consents, instruments, releases of liens and encumbrances or documents of similar effect, and other documents necessary to give effect to the Plan, and authorizing the Trustee to file such documents to the extent necessary in connection therewith (the "Direction");

g.       waiving the 14-day stay of effectiveness of the order; and

h.       granting related relief;

and upon the record of this case and the hearing held on _____, 2022 (the "Hearing") on the Petition and this Court's review and consideration of the Petition and the Liang Declaration; and the Court having found and determined that the relief sought in the Petition is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor and its creditors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.       This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431

---

[3] The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

from the U.S. District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

B.      The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.

C.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1) because (i) the Debtor has U.S. assets that are located within this District and (ii) the Indenture is governed by New York law and contains a New York forum selection clause.

D.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q) and the *Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying the Form and Manner of Service of Notice* [Docket No. ____]   to   (i) the United States Trustee for the Southern District of New York; (ii) counsel to the Ad Hoc Committee; (iii) the Trustee; (iv) the Plan Creditors (including the Noteholders); and (v) all parties that have filed a notice of appearance in this Chapter 15 Case.  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

E.      No objections or responses were filed that have not been overruled, withdrawn, or otherwise resolved.

F.      The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.      The PRC Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

H.     The PRC Proceeding is pending in the PRC, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code.  As such, the PRC Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

I.     The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.     This Chapter 15 Case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

K.     The Foreign Representative and the Debtor, as applicable, are entitled to the additional assistance and discretionary relief requested in the Petition (including recognition and enforcement of the Plan (and the Releases contained therein) and the Approval Order) under sections 1507 and 1521 of the Bankruptcy Code.

L.     The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code, and will not cause hardship to any party in interest.  To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor and its creditors, and other parties in interest.

M.      The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and all parties in interest.

N.      Absent the relief granted herein, the Plan, the PRC Proceeding, and the Debtor's efforts to consummate the restructuring set forth in the Plan may be thwarted by the actions of certain creditors or other parties in interest, which would be at odds with the purpose of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such results could threaten, frustrate, delay, and ultimately jeopardize the implementation of the restructuring set forth in the Plan.  Absent the Injunction, the Debtor and its assets may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings in connection with claims under the PRC Proceeding against the Debtor and its assets located within the territorial jurisdiction of the United States, thereby interfering with and causing irreparable harm to the Debtor, its creditors and other parties in interest.  Similarly, absent the Direction, the Debtor's ability to implement the terms of the Plan and successfully complete the Financial Restructuring may be impaired.

O.      The Injunction and the Direction contained herein (i) are within the Court's jurisdiction to grant; (ii) are essential to the success and objectives of the Plan and the PRC Proceeding; and (iii) confers material benefits on, and is in the best interests of, the Debtor, its creditors, and all other parties in interest.

P.      In accordance with section 1507(b) of the Bankruptcy Code, the relief granted herein will reasonably assure: (i) the just treatment of all holders of claims against or interests in the Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the PRC Proceeding; (iii) the prevention of

preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

Q.    All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.    The Petition and the relief requested therein are granted, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

2.    The PRC Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.    The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the PRC Proceeding.

4.    All relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the PRC Proceeding, the Debtor, and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property located in the territorial jurisdiction of the United States.

5.    As of the effective date of the Plan (the "<u>Plan Effective Date</u>"), the Plan (including the Releases), and the Approval Order granted in the PRC Proceeding shall be recognized, granted comity, and given full force and effect in the United States and are binding and fully enforceable in accordance with their terms pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose

6

claims or interests are affected by the Plan and each of their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, other than the Debtor and its expressly authorized representatives and agents, the "<u>Affected Entities</u>"), whether or not the Affected Entity consented to be bound by or participated in the Plan.

6.     As of the Plan Effective Date, except as expressly permitted by the Plan or any other document giving effect to the Plan, including the Amendment Documents, all Affected Entities shall be hereby permanently enjoined from asserting any debt, claim, or interest affected by the Approval Order and the Plan, including, without limitation:

a.     executing against any of the Debtor's assets;

b.     commencing or continuing, including issuing or employing process, of a judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements, or otherwise against the Debtor, its property, or any direct or indirect transferee of or successor to any property of the Debtor, or any property of such transferee or successor, or the seeking of any discovery related to any of the foregoing, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law or the implementation or consummation of the Approval Order or the Plan (including the Releases);

c.     taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff or other claim against the Debtor or any of its property or proceeds thereof, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law or the implementation or consummation of the Approval Order or the Plan (including the Releases);

d.     transferring, relinquishing, or disposing of any property of the Debtor to any entity other than the Foreign Representative and his authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law

or the implementation or consummation of the Approval Order or the Plan (including the Releases);

e.      commencing or continuing in any manner, directly or indirectly, an individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities, or to resolve any dispute arising out of any provision of the Plan, including the Releases, or PRC law relating to the Plan, in each case, to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code; and

f.      declaring or considering the filing of the PRC Proceeding, the Plan, the Approval Order, or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement;

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

7.      As of the Plan Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any other person released under the Plan pursuant to the Releases, with respect to any debt canceled, discharged or restructured under the Plan, or as a result of PRC law relating to the Plan, shall be unenforceable in the United States, in each case, to the extent inconsistent with the Plan, the Approval Order or such law.

8.      To the extent any Affected Entity has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreements evidencing claims, liens, interests or encumbrances, in or against the Debtor's assets and has not delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of such encumbrances, (a) each such person or entity is hereby directed to deliver all such statements, instruments and releases; (b) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity asserting the same, as may be applicable.  Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments

8

necessary or appropriate to give effect to the Plan and the transaction contemplated thereunder and by this Order.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

9.       The Foreign Representative, the Trustee (including any replacement trustee, as may be applicable), and the Debtor (a) are authorized and empowered to, and may in their discretion and without further delay, execute and deliver documents to effectuate the Plan (including the Releases) and take any action and perform any act necessary to implement and effectuate the terms of this Order and, the Approval Order and the Plan and (b) shall be authorized and empowered to exercise all consent and approval rights provided for in the Plan in the manner set forth in the Plan.

10.      No action taken by the Foreign Representative, the Debtor, or their respective agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the PRC Proceeding, the documents contemplated thereunder, this Order, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

11.      No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

12.      Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Plan or any other document giving effect to the Plan, including the Amendment Documents, and nothing herein shall modify the exclusive right

of the PRC Court to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the any provision of the Plan or the Approval Order, or out of any action to be taken or omitted to be taken under the Plan or Approval Order or in connection with the administration of the Plan or Approval Order.

13.     Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

14.     The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

15.     Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

16.     This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment, or modification of this Order.

Dated: _____, 2022          _____
        New York, New York                         THE HONORABLE LISA G. BECKERMAN
                                                    UNITED STATES BANKRUPTCY JUDGE

10

**<u>Exhibit B</u>**

**Plan**

# Reorganization Plan
# of Huachen Energy Co., Ltd.

December 2021

**Contents**

**DEFINITIONS** ................................................................................................................1
**PREFACE** ......................................................................................................................5
**SUMMARY** ...................................................................................................................7
**MAIN BODY** ..............................................................................................................12
**I.**   **Basic Information of Huachen Energy** ..........................................................12
    **(1)**   **Establishment** ........................................................................................12
    **(2)**   **Acceptance of the Case of Reorganization** ..........................................12
    **(3)**   **Assets** ......................................................................................................12
    **(4)**   **Liabilities** ...............................................................................................13
    **(5)**   **Solvency Analysis** ..................................................................................14
**II.**   **Proposed Classification of Creditors** ..............................................................15
    **(1)**   **Secured Creditors' Group** ....................................................................15
    **(2)**   **Ordinary Creditors' Group** ..................................................................15
**III.**   **Proposal for the Repayment of Claims** ...........................................................15
    **(1)**   **Secured Claims** ......................................................................................15
    **(2)**   **Ordinary Claims** ...................................................................................15
    **(3)**   **Expected Claims** ....................................................................................21
**IV.**   **Operational Plan** ...............................................................................................21
    **(1)**   **Overall Positioning, Vision and Goal for the Future** ..........................21
    **(2)**   **Operation Scheme** .................................................................................21
    **(3)**   **Supporting Measures** ............................................................................25
**V.**   **Implementation of the Reorganization Plan** ..................................................27
    **(1)**   **Entity Responsible for Implementation** ...............................................27
    **(2)**   **Implementation Period** .........................................................................27
    **(3)**   **Extension of Implementation Period** ....................................................27
    **(4)**   **Criteria for Completion of Implementation** ........................................27
    **(5)**   **Release of Pledge Registration** .............................................................28
**VI.**   **Supervision of Implementation of the Reorganization Plan** .........................28
    **(1)**   **Supervision Subject** ...............................................................................28
    **(2)**   **Supervision Period** ................................................................................28
    **(3)**   **Extension of Supervision Period** ..........................................................28
    **(4)**   **Termination of Supervision Period** ......................................................29
**VII.**   **Other Explanatory Matters in respect of the Reorganization Plan** ..............29
    **(1)**   **Conditions to Effectiveness of the Reorganization Plan and its Effects** ............29
    **(2)**   **Payment of Reorganization Costs and Settlement of Common Benefit Debts** .................29
    **(3)**   **Distribution and Deposit of Available Funds** .......................................30
    **(4)**   **Settlement of Transferred Claims** ........................................................31
    **(5)**   **Release of the Debtor's Assets from Enforcement Measures** ..............31
    **(6)**   **Treatment of Defaulted Bonds** .............................................................31
    **(7)**   **Restoration of the Debtor's Credit Ratings** .........................................32
    **(8)**   **Interpretation and Amendment to the Reorganization Plan** ...............33

## DEFINITIONS

Unless otherwise expressly indicated in the Reorganization Plan, the following terms have the following meanings:

| | | |
|---|---|---|
| "Beijing No. 1 Intermediate Court" or "Court" | means | the No. 1 Intermediate People's Court of Beijing Municipality |
| "Nanjing Intermediate Court" | means | the Intermediate People's Court of Nanjing Municipality, Jiangsu Province |
| "Huachen Energy" or "Company" or "Debtor" | means | Huachen Energy Co., Ltd. |
| "Wintime Group" | means | Wintime Holding Group Co., Ltd. |
| "Wintime Energy" | means | Wintime Energy Co., Ltd. |
| "Yuzhong Energy" | means | Zhengzhou Yuzhong Energy Co., Ltd. |
| "Zhoukou Longda" | means | Zhoukou Longda Power Generation Co., Ltd. |
| "Wintime Technology" | means | Wintime Technology Investment Co., Ltd. |
| "Huaxing" | means | Zhangjiagang Huaxing Power Co., Ltd. |
| "Huaxing Jincheng" | means | Zhangjiagang Huaxing Jincheng Power Co., Ltd. |
| "Huayuan New Energy" | means | Huayuan New Energy Co., Ltd. |
| "Zhangjiagang Shazhou Electric Power" | means | Zhangjiagang Shazhou Electric Power Co., Ltd. |
| "Yihua Mining" | means | Shaanxi Yihua Mining Development Co., Ltd. |
| "CBIRC" | means | China Banking and Insurance Regulatory Commission |
| "PBOC" | means | People's Bank of China |
| "CSRC" | means | China Securities Regulatory Commission |
| "Wintime FICC" | means | Wintime Financial Institutional Creditors' Committee |
| "Administrator" | means | Ernst & Young Hua Ming LLP (Special General Partnership), the administrator to Huachen Energy as appointed by the Beijing No. 1 Intermediate Court |
| "Shanghai Runliangtai" | means | Shanghai Runliangtai Internet of Things Technology Partnership (Limited Partnership) |

1

| "USD Bonds" | means | USD500,000,000.00 6.625% Senior Notes Due 2020 issued by Huachen Energy |
|---|---|---|
| "Trustee" | means | Citicorp International Limited, as trustee in respect of the USD Bonds, or any replacement trustee who has replaced Citicorp International Limited as trustee in respect of the USD Bonds |
| "USD Bond Indenture" | means | the indenture for the USD Bonds dated 18 May 2017 entered into between Huachen Energy and Citicorp International Limited (as the Trustee) or such indenture as may be supplemented or amended by one or more supplemental indenture(s) executed pursuant to applicable provisions of the indenture from time to time (including all annexes to such indenture) |
| "Tabulation Agent" | means | the tabulation agent appointed by the Administrator to collect and tabulate the voting instructions of the USD Bondholders on this Reorganization Plan, and deliver such voting instructions to the Administrator |
| "Creditors' Committee" | means | the creditors' committee for the reorganization proceeding as elected and appointed by the first creditors' meeting of Huachen Energy |
| "Reorganization Plan" | means | the draft reorganization plan formulated and submitted by the Administrator to the Court and the creditors' meeting |
| "Appraisal Institution" | means | China Enterprise Appraisal Co., Ltd. (北京中企华资产评估有限责任公司), a company which provides asset appraisal services to Huachen Energy with respect to its reorganization |
| "Appraised Value" | means | the appraised value in connection with the liquidation of Huachen Energy's assets as confirmed by an asset valuation report, with 20 August 2021 as the reference date of appraisal |
| "Valuation Report" | means | "*Report on the Liquidation Value of Assets involved in the Reorganization of Huachen Energy Co., Ltd.*" (Zhong Qi Hua Ping Bao Zi (2021) No. 4438) issued by the Appraisal Institution |
| "Solvency Analysis Report" | means | "*Report on the Ability of Huachen Energy Co., Ltd. to* |

| | | |
|---|---|---|
| | | *Repay its Debts in connection with that Company's Reorganization"* (Zhong Qi Hua Ping Zi Zi (2021) No. 4455) issued by the Appraisal Institution |
| "Enterprise Bankruptcy Law" | means | the *Enterprise Bankruptcy Law of the People's Republic of China* effective from 1 June 2007 |
| "Creditor(s)" | means | any, some or all of the creditor(s) of Huachen Energy that meet(s) the requirements under Article 44 of the Enterprise Bankruptcy Law |
| "Principal Claims" | means | Creditors' claims in respect of which Huachen Energy is the principal or primary debtor |
| "Employee's Claims" | means | Creditors' claims for salaries, medical and disability subsidies and pension expenses payable to the Debtor's employees, basic pension insurance and basic medical insurance expenses due to the individual accounts of employees and compensation that shall be paid to employees, each as prescribed by laws and administrative regulations under Article 82(2) of the Enterprise Bankruptcy Law |
| "Tax Claims" | means | Creditors' claims resulting from taxes due from the Debtor as stipulated in Article 82(3) of the Enterprise Bankruptcy Law |
| "Secured Claims" | means | Creditors' claims which are secured against specific property of the Debtor as stipulated in Article 82(1) of the Enterprise Bankruptcy Law, and claims with priority of repayment from the price of specific construction works of the Debtor as stipulated in Article 807 of the *Civil Code of the People's Republic of China* |
| "Ordinary Claims" | means | Creditors' ordinary claims against Huachen Energy as stipulated in Article 82(4) of the Enterprise Bankruptcy Law |
| "Undeclared Claims" | means | Creditors' claims as recorded in the Company's accounts that have not been proved during the specified period (within which Creditors are to prove their claims) but which may still be subject to legal protection |

| | | |
|---|---|---|
| "Pending Claims" | means | Creditors' claims that have been the subject of a proof but which have not been confirmed or admitted by the Administrator due to any pending litigation, need for additional evidence or further review or other similar reasons |
| "Expected Claims" | means | the Pending Claims and the Undeclared Claims |
| "Affiliated Ordinary Claims" | means | the Ordinary Claims in respect of which Huachen Energy is the primary debtor and affiliates of Huachen Energy are the Creditors, as listed in Annex 3 |
| "Unaffiliated Ordinary Claims" | means | the Ordinary Claims in respect of which Huachen Energy is the primary debtor, which are not listed in Annex 3 |
| "Approval of the Reorganization Plan" | means | the approval of the Reorganization Plan by the Court under the second paragraph of Article 86 of the Enterprise Bankruptcy Law, or the approval of the draft Reorganization Plan by the Court under Article 87(3) of the Enterprise Bankruptcy Law |
| "Reorganization Acceptance Date" | means | 20 August 2021 |
| "Implementation Period" | means | the period for implementation of the Reorganization Plan as specified therein and any extended period for implementation of the Reorganization Plan as determined by the Court in accordance with Article 81(5) of the Enterprise Bankruptcy Law |
| "Supervision Period" | means | the period specified in the Reorganization Plan for the Administrator to supervise the implementation of the Reorganization Plan as required under Article 90 of the Enterprise Bankruptcy Law |
| "RMB" | means | Renminbi; the currency unit used in the Reorganization Plan is Renminbi unless specifically indicated |
| "day" | means | a calendar day |

# PREFACE

Affected by various factors such as the continual expansion of its debt exposure, further tightening of the PRC financing policies and debt defaults by its parent company Wintime Energy, Huachen Energy was exposed to default risks in 2019. Because of its failure to settle its due and payable debts and its loss of ability to refinance, Huachen Energy currently has limited cash flow and remains in debt default.

In order to comprehensively resolve its debt problems, the Wintime FICC was formed in August 2018 under the guidance of the CBIRC and with the participation of relevant departments such as the PBOC and the CSRC. With the coordination and support of governments at different levels, various other institutions and the Wintime FICC and through the consistent effort made over the past two years, the Intermediate People's Court of Jinzhong Municipality, Shanxi Province, ruled in December 2020 that Wintime Energy, the parent company of Huachen Energy, had consummated the implementation of its reorganization plan, successfully completing Phase I of the work of Wintime Group for resolving its debts. On 6 July 2021, the Nanjing Intermediate Court ruled that it accepted the case involving the reorganization of Wintime Technology. On 22 September 2021, Nanjing Intermediate Court further ruled that it accepted the case involving the merger and reorganization of five companies (including Wintime Technology); and on 30 November 2021, the second creditors' meeting (in relation to the substantial consolidation and reorganization of five companies including Wintime Technology) voted in favour of the "Substantial Consolidation and Reorganization Plan in respect of Wintime Technology and four other companies within the Wintime Group (Draft)". On 20 August 2021, the Beijing No. 1 Intermediate Court ruled that it accepted the case involving the reorganization of Huachen Energy, marking the final stage of the Wintime FICC's strategy for resolving the group's debt crisis according to the principle of "risk diffusion as a whole and implementation step by step".

Since the Court's acceptance of the bankruptcy reorganization case of Huachen Energy, the Administrator has performed relevant duties in strict compliance with the Enterprise Bankruptcy Law and under the supervision and guidance of the Beijing No. 1 Intermediate Court for the purposes of ensuring the success of the reorganization and avoiding the bankruptcy liquidation of Huachen Energy. On the one hand, the Administrator has assisted Huachen Energy in conducting its production and operation in an orderly manner and ensured the steady operation, environmental compliance and stable workforce of its subsidiaries. On the other hand, the Administrator has made all endeavours to proceed with various tasks such as the proof and review of claims, communication and coordination with the Creditors, as well as the deliberation and preparation of the draft Reorganization Plan. The Beijing No. 1

5

Intermediate Court closely supervised and scrutinized this case in all aspects, from the stage of consideration and acceptance of the bankruptcy case to after the appointment of the Administrator, and gave timely guidance on major issues to ensure that the reorganization proceeding is conducted in compliance with applicable laws and that the legitimate rights and interests of all parties concerned are safeguarded in a practical manner.

During the design, deliberation and preparation of the Reorganization Plan, the Administrator listened to and took into consideration the opinions of and feedback received from Creditors, gave sufficient weight to the professional appraisal conclusion drawn by the Appraisal Institution and their solvency analysis and carried out adequate risk assessments and feasibility predictions and analyses. On this basis, and taking into account the actual situation of Huachen Energy, the Administrator formulated the Reorganization Plan for consideration and voting by the Creditors at the creditors' meeting in accordance with the relevant requirements of the Enterprise Bankruptcy Law.

With the resolution of Huachen Energy's debt risks as its focal point, and the protection of Creditors' legitimate rights and interests according to applicable laws and the increase of Creditors' rate of recovery to the greatest extent possible as its objectives, the Reorganization Plan takes into full account the requests from interested parties and strikes a sound balance of all parties' interests. Through the successful implementation of the Reorganization Plan, the financial position of Huachen Energy will be thoroughly improved and its profitability will continue to increase, which would offer all Creditors with a greater, more certain return. In order to achieve the aforesaid objectives and avoid greater losses to the Creditors as a result of the bankruptcy liquidation of Huachen Energy, we earnestly request that Creditors take active actions to support the Reorganization Plan in accordance with applicable laws.

# SUMMARY

Huachen Energy is in serious shortage of current cash flow. In order to enhance the feasibility of the Reorganization Plan and increase the chance of success of the reorganization, Huachen Energy will settle its outstanding claims as of 20 August 2021 in the following manner:

**I. Huachen Energy will settle Secured Claims in the following manner:**

Secured Claims in respect of Huachen Energy are all claims where Huachen Energy provided security for debts of its affiliated companies by creating mortgage or pledge over its own property. As the affiliated companies (whose debts are secured against assets of Huachen Energy) are in normal operation, and the debtor-creditor relationships are relatively stable, these Secured Claims will continue to be serviced and repaid by the principal debtors. Huachen Energy will keep the existing security unchanged.

**II. Huachen Energy will settle the Ordinary Claims in the following manner:**

**(1) The Ordinary Claims in connection with Huachen Energy as the principal Debtor**

An Ordinary Claim in connection with Huachen Energy as the principal Debtor will be retained and have their maturity dates extended. The specific arrangement is set out as follows:

1. Extended maturity

The period of extended maturity shall commence from the date on which the Reorganization Plan of Huachen Energy is approved by the Court (inclusive of that day) and end on the expiry of the 5-year period or 31 December 2026, whichever is earlier.

2. Interest during the extended maturity

Interest shall accrue on the principal amount of an outstanding claim at the latest 5-year LPR published by the National Interbank Funding Center prior to the submission of the Reorganization Plan to the Court and the Creditors' meeting (the "5-year LPR") starting from the date on which the Reorganization Plan is approved by the Court (inclusive of that day). Interest shall be calculated every six months (the daily interest rate to be calculated at the applicable interest rate / 365).

3. Arrangement for Repayment of Principal and Interest

(1) Interest Payment

For the 1st and 2nd years from the date on which the Reorganization Plan is approved by the Court (inclusive of that day): interest shall be calculated and paid at an interest rate of 2.3%

p.a.

For the 3rd and 4th years from the date on which the Reorganization Plan is approved by the Court (inclusive of that day): interest shall be calculated and paid at an interest rate of 2.9% p.a.

For the 5th year from the date on which the Reorganization Plan is approved by the Court (inclusive of that day): interest shall be calculated and paid at the 5-year LPR.

For the first four years, additional interest (calculated at the 5-year LPR *less* the interest paid in case in accordance with the above schedule) will, for the purposes of calculating the interest for the next interest period, be included in the outstanding principal amount of the Ordinary Claims. All such additional interest (to the extent unpaid) shall be paid in a lump sum on the maturity date.

The interest calculation dates for each year shall be 20 June and 20 December; the date following the interest calculation date shall be the interest payment date; the first interest payment date shall be 21 June 2022. If any of the above dates is a public holiday or a weekend, such date shall be postponed to the 1st business day immediately thereafter and no interest shall be separately calculated on the amounts payable for the postponement period.

(2) Repayment of Principal

For the first four years after the date on which the Reorganization Plan is approved by the Court (inclusive of that day), only interest and no principal will be repaid (with the exception of the arrangement for early repayment, as described below); the outstanding principal shall be repaid in a lump sum on the maturity date.

(3) Mechanism for Increase of Interest Rate

If Huachen Energy fails to pay any interest or principal due in accordance with the above, interest shall be calculated and paid at an annual interest rate of the 5-year LPR + 200BP from the date of such default.

4. Form of security

During the extended maturity, Huachen Energy will pledge its ownership interest in the partnership of Shanghai Runliangtai and its equity interest in Huayuan New Energy to a representative of the Creditors, Pacific Securities Co., Ltd.

(1) Following the approval by the Court of the Reorganization Plan, Huachen Energy shall enter into an agreement for the pledge of its ownership interest in the partnership of Shanghai Runliangtai with the abovementioned representative and also complete the registration of such pledge with the Credit Reference Center of the PBOC.

(2) Following the approval by the Court of the Reorganization Plan, Huachen Energy shall enter into an agreement for the pledge of its equity interest in Huayuan New Energy with the

8

abovementioned Creditors' representative and complete the registration of such pledge.

The beneficial entitlement of each Creditor with respect to the equity interest (or ownership interest) pledged by the Company to Pacific Securities Co., Ltd. as representative shall be calculated as follows:

(Amount of the Principal Claim of each Creditor ÷ Total amount of all Principal Claims) × Number of shares (ownership interest) held by Huachen Energy in the above enterprises

5. Early Repayment and Discount

If, during the extended maturity, Huachen Energy recovers any funds from the following three sources and an aggregate amount of proceeds recovered from each source exceeds the total amount of interest payable for the coming one year within the extended maturity, then Huachen Energy shall, within 30 days after receiving the proceeds (which satisfy the above conditions), issue to the Creditors a notice in respect of the early repayment of their claims using the excess amount. Where the proceeds are credited to the Company by instalments, such that the Company is expected to become obliged to issue multiple notices for early repayment of Creditors' claims within a short period of time, then the Company shall be entitled to accumulate all such proceeds received within 3 months following the issuance of the first notice and then issue a further notice in respect of the aggregate amount received within 10 days following the expiration of the 3-month period.

Source 1: Where Huachen Energy successfully disposes of its ownership interest in the partnership of Shanghai Runliangtai, or if Shanghai Runliangtai distributes dividends to, or is liquidated and makes distributions to, Huachen Energy;

Source 2: Huayuan New Energy successfully disposes of its relevant interest in Definite Arise Limited and transfers to Huachen Energy, by way of shareholder dividends or otherwise, the cash proceeds from such a disposal;

Source 3: Yuzhong Energy successfully disposes of its equity interest in Yihua Mining and transfers to Huachen Energy, by way of loan repayment or otherwise, 50% of the cash proceeds from such a disposal (following deductions of funds needed to satisfy the secured liabilities against such asset); provided that the 50% of cash proceeds to be transferred to Huachen Energy will be capped at the total amount of debt repayable by Yuzhong Energy to Huachen Energy.

Creditors may elect whether to accept the offer of early repayment from Huachen Energy, and shall, within 15 days from the date of receipt of the relevant notice, serve the *Notice of Election in respect of Early Repayment* (see Annex 1 for details) to Huachen Energy in such form as prescribed by the Administrator.

If a Creditor elects not to accept the early repayment, or fails to serve the *Notice of Election in respect of Early Repayment* on Huachen Energy in such form as prescribed by the

Administrator within 15 days from the date of receipt of the notice, Huachen Energy shall continue to make repayments pursuant to the arrangement described in the preceding sections of the Reorganization Plan. If a Creditor elects to accept the early repayment of its claims, Huachen Energy will use the excess amount to settle the outstanding principal of the claims at the following discounts (which discounts only apply after those portions of Claims (other than the principal amounts) which were due as at 20 August 2021 have been repaid in full):

①  If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 1st year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 80% of the outstanding principal;

②  If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 2nd year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 85% of the outstanding principal;

③  If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 3rd year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 90% of the outstanding principal;

④  If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 4th year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 95% of the outstanding principal;

Unless otherwise required by laws or regulations, the above repayments do not include any withholding tax or other costs, and Huachen Energy and the Creditors shall each pay their own taxes (if any) according to applicable laws.

6. Special Repayment Arrangement for Affiliated Creditors

If a Creditor with an Affiliated Ordinary Claim votes in favour of the Reorganization Plan, then it shall be deemed to agree that: following the extension of the maturity of Claims under the Reorganization Plan, its Ordinary Claim shall not be repaid prior to the repayment in full of all Ordinary Claims of unaffiliated creditors in accordance with the Reorganization Plan, and its Ordinary Claim shall not have the benefit of any form of security as described above.

**(2) Ordinary Claims in connection with Huachen Energy as Guarantor**

Since those affiliates of Huachen Energy whose debts are guaranteed by Huachen Energy are operating normally and have a stable debtor-creditor relationship with their creditors, these Ordinary Claims against Huachen Energy (as guarantor) shall continue to be settled by the principal debtors, and the existing guarantees granted by Huachen Energy will remain unchanged.

**(3）Expected Claims**

Expected Claims mainly include claims which have been submitted to the Administrator, but which have not yet been reviewed and admitted by the Administrator because of any

pending litigations and other reasons, and those claims that are specified in the Company's books and records but which have not been proved to the Administrator. In this bankruptcy reorganization case, the Administrator has made provisions for such claims based on the Administrator's preliminary review of the submitted claims, the claimed amount or the amount specified in the Company books and records, and once such claims are admitted or confirmed by effective legal documentation, they shall be repaid in accordance with the same arrangement as is applicable to claims falling within the same category.

# MAIN BODY

## I. Basic Information of Huachen Energy

### (1) Establishment

Huachen Energy was incorporated on 27 December 1999 and registered with the Administration for Market Regulation in Haiding District, Beijing, with the unified social credit code: 911101087002406704. It has registered capital of RMB10 billion. The Company's scope of business includes: property management; investment in electric power and energy projects; development of electric power technology and technical consultation; and electric power engineering designs. (Market players choose their own business projects and carry out business activities in accordance with applicable laws; for projects that are subject to approvals required under applicable laws, business activities shall be carried out after approval by the relevant departments and in accordance with any conditions for approvals; no business activities should be undertaken which are prohibited and restricted by the national and the city's industrial policies.)

### (2) Acceptance of the Case of Reorganization

Huachen Energy voluntarily filed an application for bankruptcy reorganization with the Beijing No. 1 Intermediate Court on the grounds of its inability to pay its debts when due and its clear insolvency. Following a review of the case, the Beijing No. 1 Intermediate Court considered that Huachen Energy failed to pay its debts when due and clearly insolvent due to a serious shortage of capital, thus meeting the conditions for reorganization. The Court handed down the *Civil Ruling* ((2021) Jing 01 Po Shen No. 382) on 20 August 2021 determining that the bankruptcy reorganization case of Huachen Energy should be accepted; in addition, it issued the *Decision* ((2021) Jing 01 Po No. 183) on 15 September 2021 appointing Ernst & Young Hua Ming LLP (Special General Partnership) as the Administrator.

### (3) Assets

According to the Valuation Report, the total Appraised Value of Huachen Energy's assets as of the reference date of valuation was RMB13,316,751,931.10, including the Appraised Value of current assets and non-current assets totaling RMB3,610,586,637.33 and RMB9,706,165,293.77, respectively, the details of which are shown as follows:

Unit: RMB0'000

| Item | Consolidated Appraised Value |
|---|---|
| Cash and cash equivalents | 114.12 |
| Other receivables | 360,880.70 |
| Other current assets | 63.84 |

| Item | Consolidated Appraised Value |
|---|---|
| Total current assets | 361,058.66 |
| Long-term equity investments | 954,792.54 |
| Fixed assets | 8,321.45 |
| Other non-current assets | 7,502.53 |
| Total non-current assets | 970,616.52 |
| Total assets | 1,331,675.18 |

### (4) Liabilities

1. Proof of Claims

As of 19 November 2021, Creditors who have submitted their claims to the Administrator have claims totaling RMB 25,517,735,297.96, including Secured Claims of RMB 5,278,049,156.35 and the Ordinary Claims of RMB 20,239,686,141.61.

2. Review of Claims

Following a preliminary review and confirmation, the Administrator has submitted a list of Claims to the first creditors' meeting for verification; and as of the date of submission of this Reorganization Plan, the total amount of the Claims (to which neither the Creditors nor the Debtor have raised any objections) amounted to RMB 24,547,649,639.47, including Secured Claims of RMB 5,063,049,156.35 and Ordinary Claims of RMB 19,484,600,483.12. The amount and nature of the above claims shall ultimately be determined and confirmed by the Beijing No. 1 Intermediate Court.

Those Creditors who have submitted their claims to the Administrator and whose claims have been preliminarily reviewed by the Administrator, but which, as of the date of submission of this Reorganization Plan, have not been verified by the creditors' meeting, amounted to RMB 230,269,152.62, all of which are Ordinary Claims. The amount and nature of the above claims remain subject to verification by the creditor's meeting, and shall ultimately be determined and confirmed by the Beijing No. 1 Intermediate Court.

3. Expected Claims

The Expected Claims against Huachen Energy mainly includes claims to which the following scenarios apply:

(1) the claim which has been submitted by the Creditors to the Administrator, but the Administrator has not yet been able to determine the claim due to pending litigations, the need for additional evidence/information or for any other reasons. Such claims amounted to RMB 16,224,657.54, which all are Ordinary Claims. The amount and nature of such claims will ultimately be determined by reference to the Administrator's confirmation or the relevant effective legal documentation.

(2) according to the Company's books and records, statements from the Company and other information available to the Administrator, potential claims which are not proved within

13

the period for proof of claim but which may still be subject to legal protection.

**(5) Solvency Analysis**

According to the Solvency Analysis Report issued by the Appraisal Institution, if Huachen Energy enters into bankruptcy liquidation, and assuming that its assets can be realised at the Appraised Value, pursuant to the priority of payments as specified in the Enterprise Bankruptcy Law: the proceeds from realisation of collateral will first be used to repay Secured Claims, and proceeds from the realisation of all other remaining property will, after satisfying all bankruptcy expenses, common benefit debts and Employees' Claims, be used for the distribution to the Creditors with Ordinary Claims. The specific calculations in respect of such payment priority are set out in the following table:

Unit: RMB0'000

| Item | Settlement Estimate |
|---|---|
| Asset Appraised Value | **1,331,675.18** |
| *Less:* portion of the Secured Claims that enjoy priority payment | 417,205.97 |
| *Less:* bankruptcy expenses (including the expected tax payable on disposal of property), common benefit debts and Employees' Claims | 5,000.00[1] |
| Remaining property available for distribution to the Creditors with Ordinary Claims | 909,469.21 |
| Total amount of Ordinary Claims in a liquidation | 2,062,942.88 |
| Rate of Recovery on for Ordinary Claims in a liquidation | 44.09%[2] |

According to the Solvency Analysis Report, the recovery rate in respect of Ordinary Claims in a bankruptcy liquidation of Huachen Energy is 44.09%. The pre-conditions for achieving that rate of recovery as described above are: (i) the Company's assets can be realised at the Appraised Value; and (ii) the bankruptcy expenses are within the scope predicted by the Appraisal Institution. There are still a lot of uncertainties associated with such rate of recovery, and the actual rate of recovery in respect of Ordinary Claims in Huachen Energy's bankruptcy liquidation could be even lower when compared to the estimated rate of recovery set out above. The key analysis is as follows:

1. The major assets of Huachen Energy are long-term equity investments, and its subsidiaries have only recently completed a consensual reorganization. The cash flow of the subsidiaries are primarily used for repayment of their own debts and it will be difficult for them to make dividend distributions in the near term. If Huachen Energy enters into bankruptcy liquidation, the long-term equity investments could be subject to a fire sale and their value will then be substantially discounted.

---

[1] This is an indicative estimate based on the assumption that Huachen Energy became subject to bankruptcy liquidation on 20 August 2021 and does not represent the costs actually incurred.

[2] This is an indicative estimate based on the assumption that Huachen Energy became subject to bankruptcy liquidation on 20 August 2021.

14

2. The assets of Huachen Energy in accounts receivable mainly include receivables from its subsidiaries. If Huachen Energy enters into bankruptcy liquidation, it is expected to have an adverse impact on the operation and financing, etc. of such subsidiaries, which might result in the deterioration of their cash flow and solvency and thus create significant uncertainties for the recovery of the relevant receivables.

3. In judicial practice, a bankruptcy liquidation proceeding is rather time-consuming and may incur more costs than expected, resulting in a scenario where the actual rate of recovery may be far lower than the estimated rate of recovery.

## II. Proposed Classification of Creditors

In accordance with the relevant provisions of the Enterprise Bankruptcy Law and following examination and confirmation of Creditors' claims, Creditors are grouped into those with Secured Claims and those with Ordinary Claims, as follows.

### (1) Secured Creditors' Group

Following a review by the Administrator, Huachen Energy has Secured Claims totaling RMB 5,063,049,156.35, held by 6 Creditors.

### (2) Ordinary Creditors' Group

Huachen Energy has Ordinary Claims totaling RMB 19,714,869,635.74, held by 99 Creditors, including claims totaling RMB 19,484,600,483.12 which have been confirmed and claims that were preliminarily reviewed by the Administrator but which, as at the date of this Reorganization Plan, have not yet been confirmed by the Creditors' meeting, amounting to RMB 230,269,152.62.

No Employee Claims or Tax Claims are in arrears and, as such, no employee creditors' group nor tax creditors' group was formed. The Creditors' meeting will only comprise the secured creditors' group and ordinary creditors' group which will vote on the Reorganization Plan in their respective groups.

## III. Proposal for the Repayment of Claims

The claims of Huachen Energy will be repaid in the following manner:

### (1) Secured Claims

Secured Claims in respect of Huachen Energy are all claims where Huachen Energy provided security for debts of its affiliated companies by creating mortgage or pledge over its own property. As the affiliated companies (whose debts are secured against assets of Huachen Energy) are in normal operation, and the debtor-creditor relationships are relatively stable, these Secured Claims will continue to be serviced and repaid by the principal debtors. Huachen Energy will keep the existing security unchanged.

### (2) Ordinary Claims

15

**1. The Ordinary Claims in connection with Huachen Energy as the principal Debtor**

An Ordinary Claim in connection with Huachen Energy as the principal Debtor will be retained and have their maturity dates extended. The specific arrangement is set out as follows:

(1) Extended maturity

The period of extended maturity shall commence from the date on which the Reorganization Plan of Huachen Energy is approved by the Court (inclusive of that day) and end on the expiry of the 5-year period or 31 December 2026, whichever is earlier.

(2) Interest during the extended maturity

Interest shall accrue on the principal amount of an outstanding claim at the latest 5-year LPR published by the National Interbank Funding Center prior to the submission of the Reorganization Plan to the Court and the Creditors' meeting (the "5-year LPR") starting from the date on which the Reorganization Plan is approved by the Court (inclusive of that day). Interest shall be calculated every six months (the daily interest rate to be calculated at the applicable interest rate / 365).

(3) Arrangement for Repayment of Principal and Interest

① Interest Payment

For the 1st and 2nd years following the date on which the Reorganization Plan is approved by the Court (inclusive of that day): interest shall be calculated and paid at an interest rate of 2.3% p.a.

For the 3rd and 4th years following the date on which the Reorganization Plan is approved by the Court (inclusive of that day): interest shall be calculated and paid at an interest rate of 2.9% p.a.

For the 5th year following the date on which the Reorganization Plan is approved by the Court (inclusive of that day): interest shall be calculated and paid at the 5-year LPR.

For the first four years, additional interest (calculated at the 5-year LPR *less* the interest paid in case in accordance with the above schedule) will, for the purposes of calculating the interest for the next interest period, be included in the outstanding principal amount of the Ordinary Claims. All such additional interest (to the extent unpaid) shall be paid in a lump sum on the maturity date.

The interest calculation dates for each year shall be 20 June and 20 December; the date following the interest calculation date shall be the interest payment date; the first interest payment date shall be 21 June 2022. If any of the above dates is a public holiday or a weekend, such date shall be postponed to the 1st business day immediately thereafter and no additional interest shall be separately calculated on the amounts payable for the postponement period.

② Repayment of Principal

For the first four years after the date on which the Reorganization Plan is approved by the Court (inclusive of that day), only interest and no principal will be repaid (with the exception of the arrangement for early repayment, as described below); the outstanding principal shall be repaid in a lump sum on the maturity date.

③ Mechanism for Increase of Interest Rate

If Huachen Energy fails to pay any interest or principal due in accordance with the above, interest shall be calculated and paid at an annual interest rate of the 5-year LPR + 200BP from the date of such default.

(4) Form of Security

During the extended maturity, Huachen Energy will pledge its ownership interest in the partnership of Shanghai Runliangtai and its equity interest in Huayuan New Energy to a representative of the Creditors, Pacific Securities Co., Ltd.

(1) Following the approval by the Court of the Reorganization Plan, Huachen Energy shall enter into an agreement for the pledge of its ownership interest in the partnership of Shanghai Runliangtai with the abovementioned representative and also complete the registration of such pledge with the Credit Reference Center of the PBOC.

(2) Following the approval by the Court of the Reorganization Plan, Huachen Energy shall enter into an agreement for the pledge of its equity interest in Huayuan New Energy with the abovementioned Creditors' representative and complete the registration of such pledge.

The beneficial entitlement of each Creditor with respect to the equity interest (or ownership interest) pledged by the Company to Pacific Securities Co., Ltd. as representative shall be calculated as follows:

(Amount of the Principal Claim of each Creditor ÷ Total amount of all Principal Claims) × Number of shares (ownership interest) held by Huachen Energy in the above enterprises

(5) Early Repayment and Discount

If, during the extended maturity, Huachen Energy recovers any funds from the following three sources and an aggregate amount of proceeds recovered from each source exceeds the total amount of interest payable for the coming one year within the extended maturity, then Huachen Energy shall, within 30 days after receiving the proceeds (which satisfy the above conditions), issue to the Creditors a notice in respect of the early repayment of their claims using the excess amount. Where the proceeds are credited to the Company by instalments, such that the Company is expected to become obliged to issue multiple notices for early repayment of Creditors' claims within a short period of time, then the Company shall be entitled to accumulate all such proceeds received within 3 months following the issuance of the first notice and then issue a further notice in respect of the aggregate amount received within 10 days following the expiration of the 3-month period.

Source 1: Where Huachen Energy successfully disposes of its ownership interest in the partnership of Shanghai Runliangtai, or if Shanghai Runliangtai distributes dividends to, or is liquidated and makes distributions to, Huachen Energy;

Source 2: Huayuan New Energy successfully disposes of its relevant interest in Definite Arise Limited and transfers to Huachen Energy, by way of shareholder dividends or otherwise, the cash proceeds from such a disposal;

Source 3: Yuzhong Energy successfully disposes of its equity interest in Yihua Mining and transfers to Huachen, by way of loan repayment or otherwise, 50% of the cash proceeds from such a disposal (following deductions of funds needed to satisfy the secured liabilities against such asset); provided that the 50% of cash proceeds to be transferred to Huachen Energy will be capped at the total amount of debt repayable by Yuzhong Energy to Huachen Energy.

Creditors may elect whether to accept the offer of early repayment from Huachen Energy, and shall, within 15 days from the date of receipt of the relevant notice, serve the *Notice of Election in respect of Early Repayment* (see Annex 1 for details) to Huachen Energy in such form as prescribed by the Administrator.

If a Creditor elects not to accept the early repayment, or fails to serve the *Notice of Election in respect of Early Repayment* on Huachen Energy in such form as prescribed by the Administrator within 15 days from the date of receipt of the notice, Huachen Energy shall continue to make repayments pursuant to the arrangement described in the preceding sections of the Reorganization Plan. If a Creditor elects to accept the early repayment of its claims, Huachen Energy will use the excess amount to settle the outstanding principal of the claims at the following discounts (which discounts only apply after those portions of Claims (other than the principal amounts) which were due as at 20 August 2021 have been repaid in full):

① If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 1st year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 80% of the outstanding principal;

② If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 2nd year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 85% of the outstanding principal;

③ If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 3rd year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 90% of the outstanding principal;

④ If the early repayment of all or part of the outstanding principal amount of the Claims is made within the 4th year from the date of the Court's approval of the Reorganization Plan, the early repayment will be made at 95% of the outstanding principal;

Unless otherwise required by laws or regulations, the above repayments do not include

any withholding tax or other costs, and Huachen Energy and the Creditors shall each pay their own taxes (if any) according to applicable laws.

(6) Funding Source of Repayment

① Disposal and recovery of non-principal business assets

a) Shanghai Runliangtai Internet of Things Technology Partnership (Limited Partnership)

Huachen Energy holds a 26.67% interest (paid up 17.81% in the capital) in Shanghai Runliangtai, which was established on 16 February 2015, mainly investing in internet of things and fintech sector projects as well as fintech, internet of things and culture and entertainment investment funds. In November 2021, the Administrator and the Appraisal Institution jointly paid an onsite visit to Shanghai Runliangtai for interviews and investigations to ascertain the status of operation, investment and financial condition of the fund. According to the Valuation Report (Zhong Qi Hua Ping Bao Zi (2021) No. 4437-3) issued by the Appraisal Institution, as of 30 June 2021, Huachen Energy holds a 26.67% interest (paid up 17.81% in the capital) in Shanghai Runliangtai, representing an Appraised Value of RMB 1,524,851,419.18.

It is understood from Huachen Energy that Shanghai Runliangtai contemplates exiting from and disposing of its investment projects by way of sale/IPO in next few years to complete the fund's liquidation. Huachen Energy and other limited partners are also actively engaging the general partner and encouraging it to commence work (associated with the proposed exit/disposal) and distribute the investment returns as soon as possible. Huachen Energy will use the investment returns it receives for repaying its debts.

b) Definite Arise Limited

Huayuan New Energy, Huachen Energy's wholly owned subsidiary, holds a 10% equity interest in Definite Arise Limited, the underlying assets of which is the British HPC nuclear power station project involving investment led by China General Nuclear Power Corporation. According to the Valuation Report (Zhong Qi Hua Ping Bao Zi (2021) No. 4437-2) issued by the Appraisal Institution, as of 20 August 2021, the net Appraised Value of Huayuan New Energy's interest in Definite Arise Limited is RMB 830,622,220.07.

As Huayuan New Energy has no other substantial obligations, Huachen Energy expects that payments from the disposal (of the equity interest in Definite Arise Limited) can be fully applied for repayment of its debts.

② Disposal of the equity of Yihua Mining

Yuzhong Energy, Huachen Energy's wholly owned subsidiary, holds a 70% equity interest in Yihua Mining, which holds the exploration rights to the coal mine in Haizetan, Jingbian County, Shaanxi Province. According to the Valuation Report (Zhong Qi Hua Ping Bao Zi (2021) No. 4437-1) issued by the Appraisal Institution, assuming that Yihua Mining would successfully acquire the requisite mining rights after the date of appraisal, the 70% equity

19

interest in Yihua Mining represents an Appraised Value of RMB 6,192,359,609.17.

Currently, Huachen Energy is driving the conversion of exploration rights to mining rights in respect of Yihua Mining's projects and will then actively dispose of the equity interest in Yihua Mining. 50% of the net cash proceeds from the disposal, after payment of Yuzhong Energy's secured debt (secured against the said mining assets), may be used for repayment of Yuzhong Energy's debt to Huachen Energy, and in turn for repayment of Huachen Energy's debts.

③ Additional financing

It is anticipated that by 2026, Huachen Energy's overall debt risk will be resolved and the Company will return to normal operation. By the end of 2026, Huachen Energy's debt-to-asset ratio (on a consolidated basis) will be at a relatively low level compared to the rest of the sector and the Company is expected to restore its financing ability to further ensure its repayment of debt.

④ Major Subsidiaries' future operating income inflow

According to the operating estimates provided by the Debtor, the five major operating subsidiaries of Huachen Energy (namely, Yuzhong Energy, Zhoukou Longda, Zhangjiagang Shazhou Electric Power, Huaxing and Huaxing Jincheng) will generate a total of 179,351,221,300 kWh of electricity and supply 111,317,453.60 GJ of heat in aggregate in the next five years, and generate primary operating income of RMB 65,838,638,900 and a total profit of RMB5,643,333,900, as well as net cash inflow from operating activities of RMB 12,108,712,600. The Debtor expects that after deducting those amounts reserved for necessary investment and financing arrangements of the operating entities, the remaining funds, if any, may be made available for Huachen Energy to repay part of its debts.

(7) Special settlement arrangement for affiliated Creditors

If a Creditor with an Affiliated Ordinary Claim (see Annex 3) votes in favour of this Reorganization Plan, that Creditor shall be deemed to agree that: following the extension of the maturity of Claims under the Reorganization Plan, its Ordinary Claim shall not be repaid prior to the repayment in full of all Ordinary Claims of unaffiliated creditors in accordance with the Reorganization Plan, and its Ordinary Claim shall not have the benefit of any form of security as described above.

**(2) Ordinary Claims Guaranteed by Huachen Energy as a Guarantor**

Since those affiliates of Huachen Energy whose debts are guaranteed by Huachen Energy are operating normally and have a stable debtor-creditor relationship with their creditors, these Ordinary Claims against Huachen Energy (as guarantor) shall continue to be settled by the principal debtors, and the existing guarantees granted by Huachen Energy will remain unchanged.

### (3) Expected Claims

Expected Claims consist of Pending Claims and Undeclared Claims. Where a claim has been submitted to the Administrator but not yet determined because of any pending litigations or the need for further review, it will, after it has been confirmed by the Administrator or by effective legal documentation, repaid in accordance with the same arrangement as is applicable to claims falling within the same category. In connection with the claims recorded in the Company's accounts but not submitted to the Administrator for proof, for the purposes of this reorganization, provisions will be made for those claims based on the amount recorded in the Company's accounts and they shall, following confirmation, be repaid in accordance with the same arrangement as is applicable to claims falling within the same category.

### IV. Operational Plan

The Company's operational plan will be based on its existing core thermal power generation business. Taking into account the climate of the electric power sector, the Company will constantly deepen and upgrade its business development, fully draw on its resource endowment and location advantages, actively implement the national significant deployment decision of "emission peak and carbon neutrality" in order to achieve high level growth. Unwaveringly implementing the strategy of "focusing on main business, strengthening the body, improving quality and efficiency, and transformation and development", the Company will continue to improve the operating efficiency of its stock assets, and progress the planning and arrangement of new energy transition to achieve its transformation and development, thereby safeguarding and laying a solid foundation for the successful completion of the Company's reorganization.

### (1) Overall Positioning, Vision and Goal for the Future

1. Overall Positioning: Huachen Energy has been adhering to the strategy of industrial prosperity and has actively responded to the central government's call for "ensuring stability in six areas and security of six aspects" by stabilizing employment and ensuring energy security and stability, in order to serve the country with industrial progress, to build up its strengths, and to reward investors and society with substantive results. Positioning itself as a large private electric power supplier, the Company will foster the planning and arrangement of new energy transition to achieve its transformation and development.

2. Vision: The Company aims at becoming a large private electric power supplier with regional competitiveness.

3. Goal: The Company's installed thermal power generation capacity to reach 11 million kilowatts or more; and the Company to achieve the target of "Double-Hundred" in terms of its new energy and integrated smart energy projects during the 14th Five-Year Plan period.

### (2) Operation Scheme

1. Short-term Plan: Focusing on main business, strengthening the body and restoring the corporate growth capacity.

(1) Adhering at all times to the principle that safety brings the greatest benefit, and maintaining a safe and stable production status.

First, the Company will adhere to the management policy of "putting safety first, focusing on precaution, managing with comprehensiveness", always put safety in the first place, and firmly uphold the principle that safety is the bedrock of the Company's operation and development. Secondly, the Company will put in place a sound mechanism of accident prevention with emergency preparedness and response, enabling it to prevent safety risk satisfactorily. Thirdly, the Company will put in place a solid system of production safety responsibility with supervision and management, so as to be and the leader of the industry in the region in terms of its standard of production safety. Fourthly, by persistently promoting the establishment and improvement of the standardization of production safety and a dual system of precaution and control, the Company will upgrade its standard of safety management in all aspects.

(2) Establishing the power fuel procurement center to centralize the management of coal procurement business.

In order to further regulate power fuel procurement, improve procurement efficiency, give full play to its scale advantages and reduce procurement costs, the Company has established the power fuel procurement center to centralize the management of coal procurement business. Additionally, the Company aims at reducing coal procurement costs by seeking cost-effective coal sources, improving the fulfillment rate of long-term coal contracts and increasing the procurement volume of imported coal. In conjunction with the above, the Company will introduce relevant review mechanisms to strictly assess coal procurement costs and coal blending combustion, set targets for coal procurement price control, fully control fuel prices, improve its all-round cost performance and ultimately enhance its corporate efficiency.

(3) Tapping its production potential to expand capacity and promote efficiency.

First, with the objective to increase income from its power generation business, the Company will enhance its marketing efforts, actively seek greater electricity quota and the preferred electricity quota indicator through various means including the development of unit heating, regional power grid support and ultra-low carbon emission, and go to the greatest extent possible to obtain electricity quota being traded in the market. Secondly, in line with the relevant plans of local governments and the growing demand for heat load, the Company will promptly renovate and upgrade its unit heating capacity, promote the construction of heat networks, advance its planning in the field of combined supply of heat and electricity and gas-fired power generation, and ultimately expand its overall heating (gas) capacity.

(4) Enhancing operational control, reducing costs and improving efficiency.

First, the Company will strengthen its cost control, tap into its internal potential and take effective measures to achieve cost reduction and efficiency improvement. The Company will introduce management responsibilities at all levels through organizing production and operation analysis meetings for each power plant on a regular basis, which should aim at promptly resolving major issues in each power plant's production and operation. Also, the Company will strengthen its control over labor costs and "three costs" (i.e. sales cost, management cost and financial costs) etc. through strict salary management, in order to reduce costs and improve efficiency. Further, the Company will actively promote blending and combustion of fuel and sludge to reduce costs. In addition, each of the coal-fired power plants will increase its sales effort of fly ash, and actively implement the sales model that combines monthly bidding sales to market customers with market pricing for customers with long-term contracts, so as to generate greater economic benefits.

Secondly, the Company will heighten its operational reviews, refine the cost assessment methods, put in place the mechanism that links cost control and performance review and strictly enforce its review and evaluation system to improve efficiency. The Company will also establish and polish the target assessment system focusing on profit, cash flow and tasks emphasized by the Company. With the implementation of such a system at all levels, the Company will ensure that its performance assessments are always thorough and all-round.

Thirdly, the Company will continue tapping its potential and utilizing the method of internal and external benchmarking to enhance its management efficiency. With reference to the characteristics of homogenization of products and standardization of units, each power plant is benchmarked against units of other power enterprises in the same region and of the same type in terms of power generation utilization hours, coal consumption, plant power consumption rate, fuel purchase price and unit operation management, etc. to preserve its own advantages, tackle deficiencies and strive for first-class performance.

Fourthly, the Company will make every effort to promote collective procurement and sales of equipment, materials, labor services and engineering services to boost its efficiency in key areas. The Company will implement a centralized procurement of fuel, materials, engineering services and other services to reduce batches of procurement bids and reduce costs through intensification and economies of scale.

2. Mid- and Long-term Plan: The Company will continuously improve its core competitiveness through technical innovation and market expansion, strengthen its internal production management, thereby improving production quality and efficiency. The Company will also foster its new energy transition planning and arrangement, continuously improve its profitability, and promote its high-quality transformation and development.

(1) Committing itself to the heating market, relying on its unit and geographical advantages, tapping the units' heating potential, reducing consumption while improving efficiency.

23

Firstly, Phase I of the reconstruction of cylinder cutting for heating of Yuzhong Energy's 2×320MW units is under progress, and is expected to supply heat in 2022. Upon completion of the project, the heating capacity will be increased by 400MW and the heating area will be increased by 8.8 million square meters. Once the potential heating capacity is fully unleashed, coal consumption for power generation is estimated to be reduced by about 63.6g/kWh during the heat supply season, which will substantially cut down energy consumption and bring about prominent economic benefits. Such an achievement will be significant to improving people's living standard, eliminating backward small heating boilers and enhancing the energy utilization efficiency of our society.

Secondly, the total length of Huaxing's heat supply pipeline network has reached 116 kilometers, covering the main urban areas including Zhangjiagang Development Zone and High-tech Zone. On that basis and as the construction of the additional heat network pipeline of Tangshi line begins, it is expected to meet the additional demand of about 700,000 tons of heat load each year in the region, which will further expand the Company's market share. Moreover, this will increase the proportion of natural gas heating in the Zhangjiagang area, contributing to the cause of local energy saving, coal reduction and environmental protection.

Thirdly, Zhoukou Longda will actively explore the development of unit heating and its heating business, in order to realize a transformation to cogeneration units as soon as practicable. To date, it has signed steam purchase and sale agreements with relevant enterprises, and has started supplying heat to certain enterprises, marking a breakthrough in terms of its heating business. In addition, with an aim to enhancing its market competitiveness and bring about more economic benefits, it is stepping up the expansion of its civil heat supply market and actively participating in the centralized heating projects in the main urban areas of Zhoukou City and Shangshui Count.

(2) Orderly promoting the planning and arrangement of new energy transition, accelerating the construction of the Company's new development landscape, continuously improving the Company's profitability, and enhancing efficiency through transformation and development.

First, through cooperation with well-known universities, research institutes and industry-leading corporations, the Company will speed up its transformation and arrangement in the new energy field to gradually realize a green and low-carbon transformation and development. To date, in order to continuously improve its market competitiveness, Huayuan New Energy, a subsidiary of the Company, has signed a strategic cooperation agreement with Three Gorges Electric Energy Co., Ltd. to cooperate in developing new energy projects in photovoltaics, wind power, integrated smart energy and energy storage sectors, actively exploring innovative development models, fully mobilizing resources from all parties and giving full play to the advantages of their respective systems and mechanisms.

24

Secondly, in compliance with the relevant national policies in Henan, Jiangsu and other power load centers, the Company will take full advantage of its existing power supply points to actively promote new energy and integrated smart energy projects, and strive to achieve its target of "Double-Hundred" (i.e., to complete and put into operation 1 million kilowatts of installed capacity, and to concurrently reserve 1 million kilowatts of installed capacity) in terms of new energy and integrated smart energy projects during the 14th Five-Year Plan period.

Thirdly, the Company's power plants are contemplating the development of power generation side energy storage related business, leveraging their own advantages, to promote the Company's presence in the energy storage field and cultivate new sources of profit growth. At present, Zhangjiagang Shazhou Electric Power and large state-owned enterprises are driving relevant project cooperation.

Fourthly, the Company will actively implement the co-firing of coal and biomass for power generation, in order to promote green and low-carbon transformation and development of its energy system. Among others, Zhangjiagang Shazhou Electric Power's coal and sludge co-firing power generation project has been listed as one of the 84 national reform pilot projects in terms of the technology of coal and biomass co-firing for power generation, and its technical solution is at a domestic leading level with various advantages including the ability to maintain a high operating and economic efficiency while keeping pollution emissions and fuel supply risk low. The project, after completion, will likely become a new source of profit growth for the power plant.

(3) On the basis of the corporate development strategy and capital strengths, steadily promoting the acquisition of controlling interest in relevant power projects to achieve the med- and long-term goals of the Company's scale in the electric power sector.

(4) Actively responding to the national "emission peak and carbon neutrality" policy and endeavoring to explore new carbon trading markets and look for new opportunities. Taking into account the launch of the national carbon emission trading market, the power plants will prepare and deploy resources in advance, study and introduce relevant management measures, familiarize themselves with the trading process, and carry out relevant transactions in a targeted manner.

### (3) Supporting Measures

1. Strengthening the building work of the Communist Party of China ("**CPC**") to drive new growth for the Company.

The Company will actively explore innovative ways for CPC building work, integrate party building into all work streams of the Company's development, bring into play the exemplar and vanguard role of the party branch and the party members, and promote the new development of the Company with high-quality party building. The Company will strengthen

and sharpen group work such as that in the labor union, and continuously reinforce the cohesion and morale among the employees.

2. Actively disposing of non-principal business assets and speeding up capital recovery.

The Company will actively dispose of its ownership interest in the partnership of Shanghai Runliangtai and its equity interest in Definite Arise Limited held by Huachen Energy to recover funds for debt settlement.

3. Driving the conversion of exploration rights to mining rights in the Shaanxi Yihua Haizetan coal mine project to provide safeguard the Company's debt settlement and transformation and development.

The capacity replacement plan of Shaanxi Yihua Haizetan coal mine project has been approved by the National Energy Administration and is now in the final stage of clearance. Once the conversion of exploration rights to mining rights is approved, the value of Haizetan coal mine project will increase substantially.

4. Seeking new energy projects which fit its development strategy and implementing its transformation strategy.

The Company has set up a leading group for new energy project development to drive the development of new energy and integrated smart energy projects, and earnestly implement the target of "Double-Hundred" proposed by the Company, and promote the launch and implementation of the projects as soon as practicable.

5. Strengthening team building and solidifying the foundation of its stable development.

The Company will formulate a long-term plan for talent development, and adopt the "sending-out and inviting-in" approach to cultivate the operating capability of the management team in a systematic manner. The Company will further substantiate the incentive mechanism, continue to bring in and refresh the management team and core technicians, and strengthen the foundation of stable development of the Company. The Company will also simplify its management system, truly practise the concept of a flat management, and continuously improve the team's sensitivity and responsiveness to the market.

6. Improving its corporate governance structure and establishing a scientific check and balance mechanism.

Directors and supervisors of the Company will be elected in accordance with relevant laws and regulations and the Company's articles of association to supervise the Company's operations, further improve the Company's governance structure and focus on building a reasonable decision-making mechanism and a rigid and complete risk prevention and control system. The Company will also standardize and optimize its business processes and decision-making mechanisms and ensure its compliance with applicable laws. The Company will accept supervision by the Creditors and protect their information right.

7. Optimizing and enhancing its control system and refining its management standard.

By bringing in and learning from the advanced management experience in the sector, the Company will revamp the Company's institutional settings and division of functions and responsibilities as well as business processes, optimize its control system, and ultimately derive economic benefits from a better management system.

### V. Implementation of the Reorganization Plan

#### (1) Entity Responsible for Implementation

According to Article 89 of the Enterprise Bankruptcy Law, the Debtor shall be responsible for the implementation of the Reorganization Plan.

Huachen Energy, as the Debtor in connection with this Reorganization Plan, shall be responsible for the implementation thereof.

#### (2) Implementation Period

The Implementation Period of this Reorganization Plan shall be 6 months from the date of approval of the Reorganization Plan by the Beijing No. 1 Intermediate Court. During the Implementation Period, Huachen Energy will effect repayment of its debts strictly in accordance with the provisions of this Reorganization Plan and give priority to payments of reorganization expenses and common benefit debts.

#### (3) Extension of Implementation Period

If the implementation of the Reorganization Plan cannot be completed within the above-mentioned period other than as a result of the Debtor's own fault, the Debtor shall, within 15 days prior to the expiration of the Implementation Period, submit an application to the Court for an extension of the Implementation Period, and continue to implement the Reorganization Plan within the extended implementation period approved by the Court.

#### (4) Criteria for Completion of Implementation

The implementation of the Reorganization Plan shall be deemed to be completed on the date of satisfaction of all of the following conditions:

1. The reorganization expenses and common benefit debts payable hereunder shall have been paid in full;

2. For those claims which repayment are to be deferred in accordance with the provisions of this Reorganization Plan, Huachen Energy shall have served on each relevant Creditor a *Confirmation Letter of Maturity Extension Plan* setting out the arrangements for the settlement of their claims. From the date Huachen Energy issues the *Confirmation Letter of Maturity Extension Plan* to a Creditor, the implementation of this Reorganization Plan shall be deemed to have been completed in respect of that Creditor;

3. In accordance with the provisions of this Reorganization Plan, Huachen Energy and the representative of the Creditors shall have completed the requisite procedures for pledging the applicable assets to that representative.

### (5) Release of Pledge Registration

During the extended maturity, if Huachen Energy's partnership interest in Shanghai Runliangtai and Huayuan New Energy's equity interest in Definite Arise Limited are disposed of in accordance with the provisions of this Reorganization Plan, and the price at which each such collateral is disposed of is not less than 70% of their respective Appraised Value, then the Creditors' representative (as pledgee) shall attend to and complete the procedures for releasing the pledge against the relevant collateral, and upon completing those release procedures, the proceeds of disposal shall be applied towards repayment of the Company's debts in accordance with the provisions of the Reorganization Plan.

Upon release of the relevant pledge and the successful disposal of each collateral, all proceeds shall be transferred to an escrow account monitored jointly by the Debtor and the Creditors' representative. Huachen Energy will first reserve from the sale proceeds for each collateral, an amount equal to the total amount of interest payable for the coming one year within the extended maturity; and the remaining amount will be applied towards early repayment of the Company's debts in accordance with this Reorganization Plan.

### VI. Supervision of Implementation of the Reorganization Plan

### (1) Supervision Subject

According to the provisions of Article 90 of the Enterprise Bankruptcy Law, the Administrator shall supervise the implementation of the Reorganization Plan during the Supervision Period starting from the date of approval of the Reorganization Plan by the Court.

During the Supervision Period, Huachen Energy shall accept the supervision of the Administrator and report to the Administrator in a timely manner on the status of implementation of the Reorganization Plan, the financial condition of the Company, as well as its major business decisions and any disposal of assets.

### (2) Supervision Period

The Supervision Period in respect of this Reorganization Plan shall be the same as the Implementation Period. It shall start from the date of approval of the Reorganization Plan by the Court.

### (3) Extension of Supervision Period

Depending on the status of actual implementation of the Reorganization Plan, where it is necessary to extend the time period of the Administrator's supervision of the implementation of the Reorganization Plan, the Administrator shall submit an application to the Court for an extension of the Supervision Period, and shall continue to perform its supervisory duties within

the extended period approved by the Court.

### (4) Termination of Supervision Period

Upon the expiration of the Supervision Period or upon the Debtor's completion of implementation of the Reorganization Plan, the Administrator will submit a supervision report to the Court; the Administrator's supervisory duties shall cease from the date of submission of the supervision report.

### VII. Other Explanatory Matters in respect of the Reorganization Plan

### (1) Conditions to Effectiveness of the Reorganization Plan and its Effects

1. Conditions to effectiveness of the Reorganization Plan

Pursuant to Articles 84-87 of Enterprise Bankruptcy Law, this Reorganization Plan shall take effect upon each voting group of Huachen Energy's Creditors resolving at the meeting(s) of Creditors to approve the Reorganization Plan and following approval by the Court; or upon approval by the Court even if is not approved by one or more Creditors' meeting(s).

2. Effects of the Reorganization Plan

Upon approval by the Court, this Reorganization Plan shall become binding upon both Huachen Energy and all of its Creditors. This Reorganization Plan's legal force and effect on the counterparties' rights and obligations shall also be applicable to any successor or assign of the same.

### (2) Payment of Reorganization Costs and Settlement of Common Benefit Debts

The reorganization costs include the court acceptance fee, remuneration of the Administrator, fees of other intermediaries engaged by the Administrator and the expenses incurred by the Administrator in performing its duties. In particular, the court acceptance fee shall be paid in accordance with the law. The Administrator has prepared the *Proposal for the Administrator's Remuneration* in accordance with the *Regulations of the Supreme People's Court on the Determination of the Remuneration of the Administrator in the Trial of Enterprise Bankruptcy Cases* and disclosed the same to Creditors at the first creditors' meeting in the bankruptcy reorganization case of Huachen Energy. The remuneration of the Administrator will be calculated pursuant to the above proposal and be paid upon approval by the Court. The fees of other intermediaries engaged by the Administrator shall be paid in accordance with the provisions of relevant agreements; and the expenses incurred by the Administrator in performing its duties shall be paid from time to time based on the actual situation.

The common benefit debts include debts arising from the continued performance of contracts, employees' remuneration and social insurance premiums, etc. which become payable by reason of the ongoing operation of the Debtors, which debts will be paid or settled from time to time with the Debtor's property as and when they are actually incurred.

29

**(3) Distribution and Deposit of Available Funds**

1. Distributions of available funds

For claims which maturity has been extended in accordance with this Reorganization Plan, where the conditions set out in the Reorganization Plan are satisfied, the available funds will generally be distributed to the relevant Creditors by way of bank transfer. Within 15 days of the date of approval of the Reorganization Plan by the Court, each Creditor shall provide to the Administrator, in writing, its bank account information in the form specified by the Administrator (see Annex 2) for receiving distributions. If a Creditors fails to receive any distribution by reason of its own fault or that of its related parties, or if the Creditor's account is frozen or subject to any withholding, that Creditor should bear the associated legal consequences and market risks.

A Creditor may, by writing, direct that distributions from the available funds be paid to an account designated by the Creditor, which is owned/controlled by such Creditor or owned/controlled by another entity. If the Creditor directs that distributions be paid to an account of any other entity, then the Creditor shall bear the risk of any non-receipt of distributions and be solely responsible for any other legal disputes or market risks resulting from such directions.

2. Deposit and reservation of available funds

(1) If a Creditor whose claims are recognized by the Court omits to claim a certain distribution to which it is entitled in accordance with the requirements of the Reorganization Plan, the Debtor shall deposit such distribution into a bank account designated by the Administrator. Upon making such a deposit, Huachen Energy shall be deemed to have fulfilled its payment obligations in respect of that distribution in accordance with this Reorganization Plan. If, by reason of its own fault, the Creditor fails to withdraw the deposited funds within three years of the date on which the funds were deposited into the bank account designated by the Administrator, the Creditor shall be deemed to have waived its right to receive the distribution. The deposited amount will be refunded to Huachen Energy for early repayment of its debts (that are subject to extension of maturity) on *pro rata* basis or to replenish the Company's liquidity.

(2) For those Creditors who fail to prove their claims but whose claims satisfy the conditions for repayment set out in this Reorganization Plan and for those Creditors with the Pending Claims, Huachen Energy will reserve available funds to meet those claims in accordance with the provisions of this Reorganization Plan. Any claim yet to be determined due to litigations, pending arbitration or for any other reasons shall, subject to a final determination of their amounts, be repaid in accordance with the provisions of this Reorganization Plan. If, after the repayment the above claims, part of the funds which were

reserved in accordance with this Reorganization Plan remain in reserve, the residual amount will be refunded to Huachen Energy for early repayment of its debts (that are subject to extension of maturity) on *pro rata* basis or to replenish the Company's liquidity. If any Creditor fails to claim the distributions to which it is entitled from Huachen Energy within three years after the date on which the completion of implementation of the Reorganization Plan is announced, the available funds reserved for that Creditor pursuant to the Reorganization Plan will be refunded to Huachen Energy for early repayment of its debts (that are subject to extension of maturity) on *pro rata* basis or to replenish the Company's liquidity, and will no longer be reserved for repayment of that Creditor's debts.

### (4) Settlement of Transferred Claims

If, prior to the Court's decision approving this Reorganization Plan, a Creditor transfers or subdivides its claim, resulting in an increase or improvement of its entitlements to distributions under this Reorganization Plan, then such modifications to the Creditor's claim will cause unfair prejudice to other Creditors. Accordingly, for the purposes of this Reorganization Plan, that Creditor will be repaid based on the amount or form of its claim before any such modifications.

If, after the Court's approval of the Reorganization Plan, a Creditor transfers its claims, the transferee shall receive what the transferor would have been entitled to in accordance with the terms and conditions of this Reorganization Plan; if a Creditor transfers its claim to two or more transferees, then distributions under the Reorganization Plan shall be allocated to the transferees in proportion to their respective share of the claim. If any transferee fails to receive a distribution under the Reorganization Plan by reason of the transfer, the Creditor and its transferee(s) shall bear the risk of non-receipt.

### (5) Release of the Debtor's Assets from Enforcement Measures

Within 15 days of the date of the Court's approval of this Reorganization Plan, a Creditor shall apply for, and cooperate with the Debtor in procuring, the release of the Debtor's assets from any sequestration, freezing order or other similar enforcement measures. If a Creditor fails to apply for, and cooperate with Debtor in procuring, the discharge of the sequestration or freezing order within the period specified above, the Debtor or the Administrator shall have the right to apply to the Court for the compulsory discharge of the sequestration or freezing order in accordance with applicable laws; if the relevant court considers that the Creditor's cooperation is a requisite condition to the discharge of the sequestration or freezing order and such Creditor refuses to cooperate, the Debtor may withhold the distributions to which that Creditor is otherwise entitled under this Reorganization Plan until such time as when the relevant procedures for discharging the sequestration or freezing order have been completed with the cooperation of the Creditor.

### (6) Treatment of Defaulted Bonds

31

On the date of the Court's approval of this Reorganization Plan, the repayment plan for the domestic corporate bonds and USD Bonds issued by Huachen Energy will take effect and will become binding on the Debtor and all its Creditors, and Huachen Energy shall no longer be treated as a defaulting party.

The domestic bonds "16 Huachen 01"(16 华晨 01) (bond code: 136875) will be delisted and deregistered.

For the USD bonds, on and from the date of the Court's approval of this Reorganization Plan, each USD Bondholder(including any USD Bondholder who voted against, or who did not vote on, the Plan) is deemed to have consented to, directed and authorized the following: (1) that amendments be made to the terms of the existing USD Bond Indenture which amendments shall be aligned with the terms of the Reorganization Plan; (2) that all existing defaults and events of default under the existing USD Bond Indenture are waived; (3) the Debtor, the Trustee (including any replacement Trustee replacing Citicorp International Limited), the collateral agent, other agents related to the USD Bonds and all other relevant parties to execute and deliver (including on behalf of the USD Bondholders) all necessary or appropriate documents to give effect to the foregoing contemplated amendments to the existing USD Bond Indenture and waivers of all existing defaults and events of default (the "**Amendment Documents**"), including without limitation, the Amended and Restated USD Bond Indenture, and (4) the Tabulation Agent, as proxy for the USD Bondholders, passing the USD Bondholders' voting instructions in respect of the Reorganization Plan to the Administrator. In addition, the Debtor and each USD bondholder hereby irrevocably release the Trustee (including any replacement Trustee), the Tabulation Agent and the other agents from any actual or potential liability (other than any liability arising from fraud or willful misconduct) arising out of the execution and delivery of any Amendment Documents, the transmission by the Tabulation Agent of the USD Bondholders' voting instructions on the Reorganization Plan to the Administrator, and all actions and acts taken or omitted by the Trustee (including any replacement Trustee), the Tabulation Agent and other agents (in connection with the restructuring of the USD Bonds, amendments to the USD Bond Indenture, the bankruptcy reorganization case of Huachen Energy and/or this Reorganization Plan). Following the Beijing No. 1 Intermediate Court's approval of this Reorganization Plan, the Administrator shall promptly seek recognition of the same by the US Bankruptcy Court pursuant to Chapter 15 of the US Bankruptcy Code and cause the Debtor to execute and deliver all necessary or appropriate Amendment Documents with the Trustee (including any replacement Trustee) and any other relevant parties.

### (7) Restoration of the Debtor's Credit Ratings

Within 15 days of the date of the Court's decision approving this Reorganization Plan, each Creditor who had included the Debtor into the list of dishonest judgment debtors shall apply to the relevant court for the removal of the Debtor from that list and the discharge of the

Debtor's legal representatives, principal officers and its other personnel from any spending restriction order and other credit disciplinary measures imposed on them. If the relevant court considers that the Creditor's cooperation is a requisite condition to the removal of the Debtor from the list of dishonest judgment debtors and the discharge of the Debtor's legal representatives, principal officers and its other personnel from any spending restriction order and other credit disciplinary measures imposed on them, and such Creditor refuses to cooperate, the Debtor may withhold the distributions to which that Creditor is otherwise entitled under this Reorganization Plan until such time as when the removal and discharge have been effected.

Upon the Court's decision approving this Reorganization Plan, financial institutions shall promptly adjust the credit classification of the Debtor and report to the credit department of the PBOC to revise the credit records of the Debtor to ensure that Huachen Energy's operations after the reorganization meet the credit reporter's requirements.

### (8) Interpretation and Amendment to the Reorganization Plan

1. Interpretation of the Reorganization Plan

If, during the course of implementing this Reorganization Plan, Creditors or other interested parties have different interpretations of certain parts of the Reorganization Plan which may affect the stakeholders' rights and interests, a Creditor or any other interested party may seek the Administrator's interpretation of those parts of the Reorganization Plan. Upon receipt of such request, the Administrator shall provide a fair and just explanation of relevant content of this Reorganization Plan.

2. Amendment to the Reorganization Plan

If, during the course of its implementation, the Reorganization Plan cannot be implemented due to special circumstances such as changes to national policies or changes in law, the Debtor may make one application to the Court to amend the Reorganization Plan. If permitted by the Court, the Debtor shall submit an amended Reorganization Plan within one month following the date of the Court's approval. The amended Reorganization Plan shall be submitted to the group of Creditors who are adversely affected by the proposed amendments for voting. The procedures for voting, application to the Court for approval and the Court's decision approving the proposed amendments to the Reorganization Plan shall be the same as those applicable to the original Reorganization Plan.

The Administrator of Huachen Energy Co., Ltd.

3 December 2021

33

Annex 1:

## NOTICE OF ELECTION IN RESPECT OF EARLY REPAYMENT[3]

(Only applicable to the Creditors having the Ordinary Claims
in connection with Huachen Energy Co., Ltd. as the principal Debtor)

To: Huachen Energy Co., Ltd.

Following our/my consideration of the proposal, and pursuant to the requirements of the repayment terms under the *Reorganization Plan of Huachen Energy Co., Ltd.,* we/I have decided to make the election in respect of the early repayment of our/my claim as determined and confirmed by the Court.:

□ non-acceptance of the early repayment

□ acceptance of the early repayment

We/I hereby represent that:

by putting a "√" in the appropriate box, we/I shall be deemed as having elected whether to receive the proposed early repayment;

election of both options, making no election or failure to submit the election within the specified timeframe shall all be deemed as non-acceptance of the proposed early repayment.

Name of Creditor (Chop):

(dd)      (mm) 202  (yy)

---

[3] If considered necessary, the Administrator or the Company may amend the form of this notice.

34

Annex 2:

## NOTICE OF ACCOUNT INFORMATION

## USED FOR RECEIPT OF DISTRIBUTIONS

(Applicable to the Creditors whose debts are subject to maturity extension)


To: Huachen Energy Co., Ltd.

Pursuant to the requirements of the Reorganization Plan of Huachen Energy Co., Ltd., please transfer the amount to be distributed to us/me to the following account:

Account name:

Bank with which the account is opened:

Account number:


Name of Creditor (Chop):


(dd)    (mm) 202  (yy)

Annex 3:

## TABLE FOR AFFILIATED ORDINARY CLAIMS
## OF HUACHEN ENERGY

Unit: RMB

| No. | Name of Creditors | Reviewed and Determined by the Administrator | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Principal | Interest | Others | Total | Nature of Claim |
| 1 | Zhangjiagang Huaxing Energy Engineering Co., Ltd. | 200,000,000.00 | 6,560,273.97 | 24,000,000.00 | 230,560,273.97 | Ordinary Claim |
| 2 | Huatai Mining Co., Ltd. | 700,000.00 | - | - | 700,000.00 | Ordinary Claim |
| 3 | Xintouhuaying Petrochemical (Shenzhen) Co., Ltd. | 12,000,000.00 | 6,871,342.48 | - | 18,871,342.48 | Ordinary Claim |
| 4 | Jiangsu Huachen Electric Power Sales Co., Ltd. (江苏华晨电力销售有限公司) | 14,400,000.00 | - | - | 14,400,000.00 | Ordinary Claim |
| 5 | Suzhou Huaxing Electric Power Sales Co., Ltd. (苏州华兴电力销售有限公司) | 18,000,000.00 | - | - | 18,000,000.00 | Ordinary Claim |
| 6 | Jiangsu Huachen Electric Power Group Co., Ltd. (江苏华晨电力集团有限公司) | 408,653,279.16 | - | - | 408,653,279.16 | Ordinary Claim |
| 7 | Zhoukou Huaxing Electric Power Sales Co., Ltd. (周口华兴电力销售有限公司) | 20,800,000.00 | - | - | 20,800,000.00 | Ordinary Claim |
| 8 | Ruyang Sanjili New Energy Co., Ltd. (汝阳三吉利新能源有限公司) | 4,800,000.00 | - | - | 4,800,000.00 | Ordinary Claim |
| 9 | Xuzhou Huachen Electric Power Co., Ltd. (徐州华晨电力有限公司) | 12,132,669.39 | - | - | 12,132,669.39 | Ordinary Claim |
| 10 | Zhoukou Longda Power Generation Co., Ltd. | 854,986,419.25 | - | - | 854,986,419.25 | Ordinary Claim |
| 11 | Danyang Zhongxin Huahai Clean Energy Co., Ltd. (丹阳中鑫华海清洁能源有限公司) | 10,550,000.00 | - | - | 10,550,000.00 | Ordinary Claim |
| 12 | Tibet Huachen Medical Technology Co., Ltd. (西藏华晨医疗科技有限公司) | 152,624,625.69 | - | - | 152,624,625.69 | Ordinary Claim |
| 13 | Huayuan New Energy Co., Ltd. | 151,994,974.84 | - | - | 151,994,974.84 | Ordinary Claim |
| 14 | Zhangjiagang Shazhou Electric Power Co., Ltd. | 258,810,251.25 | - | - | 258,810,251.25 | Ordinary Claim |
| | **Total** | **2,120,452,219.58** | **13,431,616.45** | **24,000,000.00** | **2,157,883,836.03** | |